**LOVELADIES HARBOR, INC. and Loveladies Harbor, Unit D, Inc., Plaintiffs–Appellees,**

v.

**The UNITED STATES, Defendant–Appellant.**

No. 91–5050.

United States Court of Appeals, Federal Circuit.

June 15, 1994.

**1172**

Kevin J. Coakley, Connell, Foley & Geiser, Roseland, NJ, argued, for plaintiffs-appel-

lees. With him on the brief were Stephen D. Kinnard and Ernest W. Schoellkopff.

Robert L. Klarquist, Atty., Dept. of Justice, Environment & Nat. Res. Div., Washington, DC, argued for defendant-appellant. With him on the brief, were Lois J. Schiffer, Acting Asst. Gen., Environmental & Nat. Res. Div., John A. Bryson, Fred Disheroon and Gary S. Guzy, Attys.

George W. Miller, Walter S. Smith, Jr., Jonathan L. Abram and Jonathan S. Franklin, Hogan & Hartson, Washington, DC, were on the brief, for amicus curiae, Whitney Benefits, Inc. and Peter Kiewit Sons' Co.

Thomas H. Shipps, Maynes, Bradford, Shipps & Sheftel, Durango, CO, and Scott B. McElroy and Alice E. Walker, Greene, Meyer & McElroy, P.C., Boulder, CO, were on the brief, for amicus curiae, Northern Ute Indian Tribe.

Charles F. Lettow, Michael R. Lazerwitz, Michael A. Mazzuchi, Cleary, Gottlieb, Steen & Hamilton, of Washington, DC, were on the brief, for amicus curiae, Dico, Inc.

Richard Dauphinais, Native American Rights Fund, Washington, DC, and Yvonne T. Knight and Patrice Kunesh, Native American Rights Fund, Boulder, CO, were on the brief, for amicus curiae, Cheyenne–Arapaho Tribe of Oklahoma.

Virginia S. Albrecht, Albert J. Beveridge, III and David G. Isaacs, Beveridge & Diamond, P.C., Washington, DC, and Mary V. DiCrescenzo, National Ass'n of Home Builders, Washington, DC, were on the brief, for amicus curiae, National Ass'n of Home Builders.

Paula K. Smith, Asst. Utah Atty. Gen., Jan Graham, Utah Atty. Gen., Salt Lake City, UT and Cheri Jacobus, Chief Asst. Atty. Gen., Dept. of Law, Anchorage, AK, and Charles E. Cole, Alaska Atty. Gen., Juneau, AK, were on the brief, for amicus curiae, States of Utah and Alaska.

Roland L. Skala, Weeks & Skala, Yakima, WA, was on the brief, for amicus curiae, Cascade Development Co., Inc.

James S. Burling, Ronald A. Zumbrun and Robin L. Rivett, Pacific Legal Foundation,

Sacramento, CA, were on the brief, for amicus curiae, Pacific Legal Foundation.

Paul D. Kamenar and Daniel J. Popeo, Washington Legal Foundation, Washington, DC, and W. Lawrence Wallace and Carolyn M. White, Vinson & Elkins, of Washington, DC, were on the brief, for amicus curiae, Wash. Legal Foundation.

Timothy D. Searchinger, Environmental Defense Fund, New York City, was on the brief, for amicus curiae, Environmental Defense Fund.

Before PLAGER, CLEVENGER, and RADER, Circuit Judges.

PLAGER, Circuit Judge.

This is a regulatory taking case. It arose when the plaintiffs (Loveladies) sought a fill permit under § 404 of the Clean Water Act[1] from the Army Corps of Engineers (Corps) to complete the final stage of an ongoing real estate development project. The Corps denied the permit on May 5, 1982. Loveladies challenged the validity of that permit denial in a proceeding in Federal District Court under § 554 of the Administrative Procedure Act.[2] *Loveladies Harbor, Inc. and Loveladies Harbor, Unit D, Inc. v. Baldwin*, Civ. No. 82–1948 (filed June 15, 1982). The challenge proved unsuccessful. *Loveladies Harbor, Inc. and Loveladies Harbor, Unit D, Inc. v. Baldwin*, Civ. No. 82–1948 (D.N.J. Apr. 3, 1984), *aff'd* 751 F.2d 376 (3d Cir.1984) (table).

Loveladies then proceeded with a suit in the Court of Federal Claims,[3] which they had filed sometime earlier, *Loveladies Harbor, Inc. and Loveladies Harbor, Unit D, Inc. v. United States*, No. 243–83 L (filed Apr. 14, 1983), seeking monetary compensation from the United States (Government). That court denied cross motions for summary judgment,

*Loveladies Harbor, Inc. and Loveladies Harbor, Unit D, Inc. v. United States*, 15 Cl.Ct. 381 (1988) (*Loveladies 1*), and after trial on the merits awarded Loveladies $2,658,000 plus interest in compensation. *Loveladies Harbor, Inc. and Loveladies Harbor, Unit D, Inc. v. United States*, 21 Cl.Ct. 153 (1990) (*Loveladies 2*). The Government here appeals this award.

Subsequent to the time this case was briefed and argued on appeal, two significant legal developments occurred which directly bear on the issues of the case. One was the decision by the United States Supreme Court in *Lucas v. South Carolina Coastal Council*, 505 U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), and the other was the decision by this court *in banc* in *UNR Industries, Inc. v. United States*, 962 F.2d 1013 (Fed.Cir.1992), *aff'd sub nom. Keene Corp. v. United States*, —— U.S. ——, 113 S.Ct. 373, 121 L.Ed.2d 285 (1992). Based on the decision in *UNR*, the Government moved to dismiss this appeal for lack of jurisdiction. Because of the importance of the jurisdictional issue, and the fact that other cases pending on appeal raised the same issue, this court, sitting *in banc*, called for supplemental briefing and argument. In a separately published opinion, we determined that this court's jurisdiction had been properly invoked; the Government's motion was denied, and the merits case ordered to proceed. *Loveladies Harbor, Inc. and Loveladies Harbor, Unit D, Inc. v. United States*, 27 F.3d 1545 (Fed.Cir.1994) (*Loveladies I*).[4]

We turn then to the merits, and in particular the effect of the Supreme Court's decision in *Lucas* on the outcome of the case.

## BACKGROUND

The property at issue in this dispute is a 12.5 acre parcel (the parcel) consisting of 11.5

1. Pub.L.No. 92–500 § 2, 86 Stat. 884 (Oct. 18, 1972), amending the Federal Water Pollution Control Act, (codified as amended at 33 U.S.C. § 1344 (1988)).

2. Administrative Procedure Act, Revised Statutes and Statutes at Large, ch. 324 § 5, 60 Stat. 239 (1946), as amended by Pub.L. No. 89–554, 80 Stat. 384 (1966), codified as amended at 5 U.S.C. § 554 (1988).

3. Effective October 29, 1992, the former Claims Court is known as the United States Court of Federal Claims. Pub.L. No. 102–572, §§ 804, 902, 106 Stat. 4506, 4516 (1992).

4. Since all of these cases have the same name, we have denominated the two trial court opinions as *Loveladies 1* and *2*, and the two appellate court opinions (this being the second) as *Loveladies I* and *II*.

acres of wetlands and one acre of filled land, located on Long Beach Island, Ocean County, New Jersey. A map showing the location of the parcel is appended to this opinion. As can be seen from the map, Barnegat Bay bounds the wetlands on the west, while single-family homes bound it on the east and southeast. The 12.5 acres is part of a 51 acre parcel owned by Loveladies, which in turn is part of an original 250 acre tract which Loveladies had acquired in 1958.[5] The balance of the 250 acres—199 acres—had been developed before 1972 and the enactment of § 404 of the Clean Water Act.

In order to develop the remaining 51 acre parcel for residential use, Loveladies needed to fill 50 acres, the one acre having been previously filled, and that in turn required Loveladies to obtain permission from both the New Jersey Department of Environmental Protection (NJDEP) and the Corps. That process proved to be lengthy and contentious, marked by several years of negotiation (with Loveladies submitting progressively less ambitious and less environmentally objectionable proposals), a 1977 permit denial, appeal of that denial to the Commissioner of NJDEP, and judicial review in state court.

During the course of the proceedings, NJDEP offered, as a compromise, permission for Loveladies to develop 12.5 of the 51 acres. Loveladies initially declined that offer. Eventually Loveladies acquiesced to the 12.5 acre limitation, the dispute was resolved, and the permit, on September 9, 1981, issued.[6] *See In re Loveladies Harbor, Inc.*, 176 N.J.Super. 69, 422 A.2d 107 (App.Div. 1980), *certif. denied* 85 N.J. 501, 427 A.2d 588 (1981). The permit granted permission to fill and develop 11.5 acres in addition to the one acre which had been filled previously—this is the 12.5 acre parcel at issue—and to construct 35 single family homes thereon.

Loveladies then sought the requisite federal permit for the development project. As required, the Corps sought the views of the counterpart state agency, the NJDEP. NJDEP in its response acknowledged that they had issued Loveladies the permit as they were obligated to do under the terms of the settlement, but denied that the permit approval was in compliance with the state's requirements. The response went on to explain that the 12.5 acre development would be "anachronistic," a "throwback to the 1950's—1960's style of shore development," and closed by noting, "[a] denial of the federal permit appears appropriate under this Division's understanding of the pertinent federal law."

The Corps rejected Loveladies' § 404 permit application on May 5, 1982. Loveladies again resorted to the courts. As previously noted, the § 404 permit denial was challenged in Federal District Court under § 554 of the APA, and that challenge was unsuccessful. *Loveladies Harbor, Inc. and Loveladies Harbor, Unit D, Inc., v. Baldwin, supra.* Between the time the District court made its decision and the appeal was decided, Loveladies filed a claim in the Court of Federal Claims for just compensation under the Fifth Amendment. That case proceeded to trial following issuance of the Third Circuit's affirmance of the district court's rejection of Loveladies' APA claims.

In response to the parties' cross-motions for summary judgment, the Court of Federal Claims initially addressed and decided several of the substantive issues in the case. The court concluded, however, that it would deny the parties' cross-motions for summary judgment on the takings issue as factual questions remained regarding the economic impact of the permit denial. *Loveladies 1*, 15 Cl.Ct. at 396, 398.

Following a full hearing, those factual issues were resolved in favor of Loveladies. *Loveladies 2*, 21 Cl.Ct. at 153. The court found that the fair market value of the parcel prior to the permit denial was $2,658,000

---

5. Joint stipulation of fact no. 1, filed September 29, 1989. The Court of Federal Claims places the date of the acquisition in 1956. *Loveladies 1*, 15 Cl.Ct. at 383; *Loveladies 2*, 21 Cl.Ct. at 153.

6. The permit was issued subject to several conditions, including a requirement that Loveladies submit a "deed restriction or conservation easement which insures that the site's remaining wetlands, lagoons, creeks, and bay bottom will not be filled or used for non-water dependent uses."

whereas the value after the permit denial was $12,500. This greater than 99% diminution of value, "coupled with the court's earlier determination of a lack of a countervailing substantial legitimate state interest," led the court to conclude that there had been a taking. *Loveladies 2*, 21 Cl.Ct. at 160 (referring to *Loveladies 1*, 15 Cl.Ct. at 388–90). The Government appeals the judgment of the Court of Federal Claims.

## DISCUSSION

At the outset we wish to make clear exactly what is at issue, and what is not. What is not at issue is whether the Government can lawfully prevent a property owner from filling or otherwise injuring or destroying vital wetlands. The importance of preserving the environment, the authority of state and federal governments to protect and preserve ecologically significant areas, whether privately or publicly held, through appropriate regulatory mechanisms is not here being questioned. There can be no doubt today that every effort must be made individually and collectively to protect our natural heritage, and to pass it to future generations unspoiled. The destruction of ancient civilizations by human misuse of the environment, such as that at Ephesus, teaches the need for public policies that work within the natural environment, rather than attempt radically to alter it.[7]

■ The question at issue here is, when the Government fulfills its obligation to preserve and protect the public interest, may the cost of obtaining that public benefit fall solely upon the affected property owner, or is it to be shared by the community at large. In the final analysis the answer to that question is one of fundamental public policy. It calls for balancing the legitimate claims of the society to constrain individual actions that threaten the larger community, on the one side, and, on the other, the rights of the individual and our commitment to private property as a bulwark for the protection of those rights.[8] It requires us to decide which collective rights are to be obtained at collective cost, in order better to preserve collectively the rights of the individual. The role of the court is to implement and enforce that public policy as it appears in governing law, in this case in the words of the Constitution and the controlling pronouncements of the Supreme Court.

## I. Takings Law at the Time of Trial

Any discussion of a takings claim necessarily begins with the Fifth Amendment to the Constitution, which concludes with the mandate: "... nor shall private property be taken for public use, without just compensation." U.S. Const. Amend. V.[9] At the time the Constitution was written and for almost 150 years after, the concern was with physical occupation of private lands by the Government. We have elsewhere reviewed in some detail the historical development of the eminent domain doctrine, the distinctions between temporary and permanent takings, and some of the interplay between physical takings doctrine and the emergent law of regulatory takings. See *Hendler v. United States*, 952 F.2d 1364 (Fed.Cir.1991). That background need not be repeated here. In *Hendler*, claims of both regulatory and physical takings were raised, but the thrust of the decision was on the physical takings aspect. This case squarely raises a regulatory takings claim and only a regulatory takings claim; it is there that we will focus.

7. For the story of Ephesus, *see* Rick Kelly, *Have We Learned Anything from Ephesus?* 49 Iowa Conservationist # 4, April 1990, at 7.

8. [T]he only dependable foundation of personal liberty is the personal economic security of private property ... There is no surer way to give men the courage to be free than to insure them a competence upon which they can rely. Men cannot be made free by laws unless they are in fact free because no man can buy and no man can coerce them. That is why the Englishman's belief that his home is his castle and that the king cannot enter it ... [is] the very essence of the free man's way of life. Walter Lippmann, The Method of Freedom 100–102 (1934).

9. As part of the Bill of Rights, this clause was added to the Constitution in 1791. The analysis that follows regarding the state of takings law at the time of trial and post-*Lucas* is addressed to the law applicable to land use regulation. We offer no opinion regarding the applicability of this analysis to other regulatory contexts.

In 1922, in the case of *Pennsylvania Coal v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322, Justice Holmes stated this oft-quoted proposition: "The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.* at 415, 43 S.Ct. at 160. In 1926, the then innovative and rapidly-spreading practice of state regulation of private land use through zoning was challenged as fundamentally having taken regulation 'too far.' The Supreme Court, in part by analogizing zoning to the historic common law control of nuisances, upheld against a charge of facial invalidity the power of government to enact and implement zoning laws. *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). However, with a nod to Justice Holmes, the Court noted that in an individual case, a zoning rule as applied could violate the protections provided by the Constitution.

Two years later, the Court struck down the specific application of the Cambridge, Massachusetts, zoning ordinance to Mr. Nectow's property as violative of the Federal Constitution, *Nectow v. City of Cambridge*, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928). For the next fifty years zoning fights were played out in the state courts, with little further guidance from the Supreme Court. Specific applications of zoning ordinances were upheld or struck down as the state courts determined, earning for some courts the epithet of super zoning board. *See generally* Richard F. Babcock, The Zoning Game (1962), and Richard F. Babcock and Charles L. Siemon, The Zoning Game Revisited (1985).

Two key questions eventually emerged in the discourse about Fifth Amendment regulatory takings: (1) were there objective legal criteria by which a regulatory taking could be identified, or was it necessarily an *ad hoc* inquiry left to the discretion of each court; and (2) was the remedy for a regulation that went too far a *post hoc* declaration of invalidity, leaving the property owner to bear the cost of the illegal restraint during the time (often years) it remained in effect, or could a court declare the restraint valid (that is, within the power of government to impose), but require the government to pay the just compensation referred to in the Fifth Amendment's mandate.

In 1978 the Supreme Court reentered the debate with an initial answer to the first question. The Court, in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), refined the notion of when a regulation 'went too far.' Three criteria would determine the outcome: (1) the character of the governmental action, (2) the economic impact of the regulation on the claimant, and (3) the extent to which the regulation interfered with distinct investment-backed expectations. *Id.* at 124, 98 S.Ct. at 2659. *Accord Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390–91, 62 L.Ed.2d 332 (1979); *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 2041–42, 64 L.Ed.2d 741 (1980).

The first criterion required that a reviewing court consider the purpose and importance of the public interest reflected in the regulatory imposition. In effect, a court was to balance the liberty interest of the private property owner against the Government's need to protect the public interest through imposition of the restraint. This included considering not only the avowed need of the Government—the interest of the public being protected, *see e.g., Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1014, 104 S.Ct. 2862, 2878–79, 81 L.Ed.2d 815 (1984) (factors to be considered included whether the Government had a legitimate interest in forced public disclosure of the company data)—but also whether the method of attaining the sought-after goal was reasonably designed to attain it. *See Nollan v. California Coastal Comm'n*, 483 U.S. 825, 837, 107 S.Ct. 3141, 3148–49, 97 L.Ed.2d 677 (1987) (requiring a "nexus" between the Government's alleged public purpose and the restriction which it places upon the landowner's right to develop the land).

The second criterion, economic impact of the regulation on the claimant, was intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim. *See Pennsylvania Coal*, 260

U.S. at 413, 43 S.Ct. at 159 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."). Reflecting in part the presumed facts in the cases, what emerged was a threshold requirement that the plaintiff show a serious financial loss from the regulatory imposition. This came to be phrased as a denial of "economically viable use of [an owner's] land." *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *Nollan,* 483 U.S. at 834, 107 S.Ct. at 3147.

The third criterion, interference with distinct investment-backed expectations, was a way of limiting takings recoveries to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime. *See, e.g., Concrete Pipe and Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.,* —— U.S. ——, ——, 113 S.Ct. 2264, 2291–92, 124 L.Ed.2d 539 (1993) (no reasonable expectation in light of Congress' legislation in the pension field); *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 226–27, 106 S.Ct. 1018, 1026–27, 89 L.Ed.2d 166 (1986) (same); *Ruckelshaus,* 467 U.S. at 1005–6, 104 S.Ct. at 2874–75 (company did not have a reasonable expectation that EPA would keep submitted data confidential, in light of the prior legislative amendments: "A 'reasonable investment backed expectation' must be more than 'a unilateral expectation or an abstract need.'" (quoting *Webb's Fabulous Pharmacies v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 450–51, 66 L.Ed.2d 358 (1980)); *Golden Pacific Bancorp v. United States,* 15 F.3d 1066 (Fed.Cir.1994) (bank holding company and stockholders had no reasonable expectation that Federal Deposit Insurance Corporation would not take over insolvent bank); *Ciampitti v. United States,* 22 Cl.Ct. 310, 321–22 (1991) (landowner who purchased wetland with knowledge of the regulatory structure and with warning that the requisite permit

was "virtually impossible to get" had no reasonable investment-backed expectations).

In legal terms, the owner who bought with knowledge of the restraint could be said to have no reliance interest, or to have assumed the risk of any economic loss. In economic terms, it could be said that the market had already discounted for the restraint, so that a purchaser could not show a loss in his investment attributable to it.

Since no taking was found to have occurred in the *Penn Central* case, the Court did not answer the second question raised above: whether, given a regulation that constitutes a taking, just compensation is required when demanded, or whether a declaration of invalidity is enough. This question was finally and definitively answered by the Court, after a number of false starts,[10] in *First English Lutheran Church v. Los Angeles County,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). The Constitution, said the Court, requires just compensation for a regulatory taking from the date it occurs until the date of the regulation's rescission or amendment. A simple *post hoc* declaration of invalidity did not provide the remedy the Constitution mandated. *Id.* at 319, 107 S.Ct. at 2388. *See also Yuba Natural Resources, Inc. v. United States,* 821 F.2d 638 (Fed.Cir. 1987) (following *First English*).

Thus the state of takings law at the time this case was decided below was based on the following analytical structure:

a) A property owner who could establish that a regulatory taking of property has occurred is entitled to a monetary recovery for the value of the interest taken, measured by what is just compensation.

b) With regard to the interest alleged to be taken, there has been a regulatory taking if

(1) there was a denial of economically viable use of the property as a result of the regulatory imposition;

---

**10.** *See MacDonald, Sommer & Frates v. County of Yolo,* 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986); *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); *San*

*Diego Gas & Elec. Co. v. San Diego,* 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981); *Agins v. Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).

(2) the property owner had distinct investment-backed expectations; and

(3) in the balance between the property owner's right to own and use the property without unwarranted governmental interference on the one hand, and on the other, the public interest asserted by the Government in support of the regulatory imposition, the liberty interest of the property owner should prevail.

Concerning the first criterion—denial of economically viable use of the land—the trial court in this case concluded that the relevant comparison for purposes of determining whether there had been a denial of economically viable use of the land by the regulatory imposition was a comparison of the value of the 12.5 acre parcel before and after the imposition. The court found that the fair market value before was $2,658,000, and after was $12,500. The diminution in value of 99% was deemed sufficient to qualify under this part of the test for a taking. *Loveladies 2,* 21 Cl.Ct. at 160.

With regard to whether the owner had investment-backed expectations—the second criterion—the trial court concluded that the facts left little doubt that such expectations drove the project. *Loveladies 1,* 15 Cl.Ct. at 396. And regarding the third criterion—the balance of public and private interests—after a lengthy consideration of the competing values offered by the Government, on the one hand, for imposing the restriction and by the property owner, on the other, for protecting the interests of private property ownership under the circumstances, the trial judge concluded that "plaintiffs have shown that their private interest in developing and utilizing their property outweighs the public value in preserving these wetlands." *Loveladies 1,* 15 Cl.Ct. at 399. Judgment was therefore rendered for Loveladies.

## II. Takings Law Now Applicable to the Case on Appeal

June 29, 1992 marked the decision in *Lucas v. South Carolina Coastal Council,* 505 U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Mr. Lucas had purchased two ocean-front lots with the intention of building a home for himself on one, and a house for sale

on the other. Between the time he purchased and the time he was ready to build, the state enacted legislation aimed at preserving and protecting the fragile ecology of the beach and dune area. Pursuant to that legislation, a state agency had determined that no buildings could be constructed oceanward of a line drawn on the upland side of Lucas' property, thus precluding Lucas from building on his property.

There was no question that Lucas had distinct investment-backed expectations for his property. And, despite the state's argument that Lucas still retained the untrammeled right to use his property to view the waves and to cross upon it to the beach (and presumably to pay the real estate taxes), there was little doubt that the economic value of his property had been essentially destroyed by the regulatory imposition.

The only real question, then, was whether the state's policy for preservation of the ocean-front ecology trumped Lucas' property rights in such a manner that Lucas should bear the full cost of the application of that policy to his property. The trial court said no. If the state wished to pursue the policy in that manner, cost to property owners must be shared by all, not just the relatively few persons on whom the policy happened adversely to impact. The trial court awarded Lucas 1.1 million dollars for the taking.

The Supreme Court of South Carolina, in a split decision, reversed. That court held that the determination by the South Carolina legislature to preserve and protect the state's ocean-front ecology reflected a paramount public policy which, when balanced against the private property rights of the individual, required that the property rights yield. Thus there was no governmental taking under the Fifth Amendment, and no compensation was owed. *Lucas v. South Carolina Coastal Council,* 304 S.C. 376, 404 S.E.2d 895 (1991).

When the Supreme Court accepted Lucas' appeal, the case was understood to confront the Court with a much-heralded opportunity to clarify how courts were to balance public interest claims against liberty claims of private property owners, and to do it in a case

in which the issue was sharply focused on fundamental ecological and environmental values. Instead, the Court recast the issue. The question, said the Court, was not one of balance between competing public and private claims. Rather the question is simply one of basic property ownership rights: within the bundle of rights which property lawyers understand to constitute property, is the right or interest at issue, as a matter of law, owned by the property owner or reserved to the state?

The Court explained that the basis for the state's reservation lies in the principles of common law nuisance. Property rights as a matter of law since Blackstone's day have been understood to be subject to the power of the state to abate nuisances. If the imposed restraint would have been justified under the state's traditional nuisance law, then the property owner's bundle of rights did not include the right claimed, and no taking could occur. The Court remanded the case to the South Carolina Supreme Court to determine, under that state's nuisance laws, whether the interest at issue was the state's or the property owner's.[11]

▌ In sum, then, to restate the law of regulatory taking as currently applicable to the case before us:

a) A property owner who can establish that a regulatory taking of property has occurred is entitled to a monetary recovery for the value of the interest taken, measured by what is just compensation.

b) With regard to the interest alleged to be taken, there has been a regulatory taking if

(1) there was a denial of economically viable use of the property as a result of the regulatory imposition;

(2) the property owner had distinct investment-backed expectations; and

(3) it was an interest vested in the owner, as a matter of state property law, and not

within the power of the state to regulate under common law nuisance doctrine.

The effect, then, of *Lucas* was to dramatically change the third criterion, from one in which courts, including federal courts, were called upon to make *ad hoc* balancing decisions, balancing private property rights against state regulatory policy, to one in which state property law, incorporating common law nuisance doctrine, controls. This sea change removed from regulatory takings the vagaries of the balancing process, so dependent on judicial perceptions with little effective guidance in law. It substituted instead a referent familiar to property lawyers everywhere, and one which will have substantial (though varying from state to state) likelihood of predictability for both property owners and regulators.

With regard to the second criterion—investment-backed expectations—it is not disputed that Loveladies purchased the land involved with the reasonable expectation and intention of developing it over time for sale to purchasers of the improved lots; that the regulation constitutes an interference with their investment-backed expectations cannot be denied. There is, however, less agreement between the parties with regard to the first and third criteria. We will address each in turn.

A. Denial of Economically Viable Use and the Denominator Problem

▌ In *Lucas*, the Court discussed but was not called upon to decide the question of whether a regulatory taking requires that there be a denial of essentially *all* remaining economic use, or whether loss of a substantial part, but not all, of the economic use may constitute a compensable partial taking. The earlier cases sometimes use language that suggests that was so, and sometimes did not. *Lucas* itself contains a discussion that ac-

---

**11.** In a summary opinion, published November 20, 1992, in response to the Supreme Court's remand, the South Carolina Supreme Court concluded "[w]e have reviewed the record and heard arguments from the parties regarding whether [the state] possesses the ability under the common law to prohibit Lucas from con-

structing a habitable structure on his land. [The state] has not persuaded us that any common law basis exists by which it could restrain Lucas' desired use of his land; nor has our research uncovered any such common law principle." *Lucas v. South Carolina Coastal Council,* 424 S.E.2d 484, 486 (S.C.1992).

knowledges both viewpoints. *Lucas*, 505 U.S. at —— n. 8, 112 S.Ct. at 2895 n. 8.

In *Florida Rock Industries, Inc. v. United States*, 18 F.3d 1560 (Fed.Cir.1994), we concluded that, depending on the legal import of the final fair market value before and after the regulatory imposition on the particular property involved, a partial taking may have occurred. We explained that in making that determination there was "the difficult task of resolving when a partial loss of economic use of the property has crossed the line from a noncompensable 'mere diminution' to a compensable 'partial taking.'" *Florida Rock*, 18 F.3d at 1570. The reference to 'mere diminution' is to those decreases in property value resulting from shared economic impacts which are the consequence of certain types of land use controls, those in which the property owner has in a sense been compensated by the public program "adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. The Court in *Lucas* described it as: "adjusting the benefits and burdens of economic life ... in a manner that secures an 'average reciprocity of advantage' to everyone concerned." *Lucas*, 505 U.S. at ——, 112 S.Ct. at 2894 (internal citations omitted).[12]

On the facts of the case before us, the question of whether there has been a partial or total loss of economic use (in the latter case a 'categorical' taking, *see Lucas*, 505 U.S. at ——, 112 S.Ct. at 2893; *Florida Rock*, 18 F.3d at 1568), depends on what is the specific property that was affected by the permit denial. If the tract of land that is the measure of the economic value after the regulatory imposition is defined as only that land for which the use permit is denied, that

provides the easiest case for those arguing that a categorical taking occurred. On the other hand, if the tract of land is defined as some larger piece, one with substantial residuary value independent of the wetlands regulation, then either a partial or no taking occurred, depending on the test as described in *Florida Rock*, 18 F.3d at 1567 *et seq.* This is the denominator problem.[13]

In this case, the Government assumes that virtually all economic use must be taken (that is, destroyed by the regulatory imposition) in order to have a compensable regulatory taking. Under that assumption, the key question is, when comparing the value of the property before and after the imposition, what is the property whose value is compared. On the facts here, is the test the effect of the imposition on the value of just the 12.5 acres, or is it the effect of the imposition on the total value of, say, the original 250 acres, or on some other size unit.

The Government argues that the proper denominator is the original 250 acre parcel or, at the least, the total acreage remaining unsold in 1982, when the permit was denied. In 1982, as we have noted, Loveladies owned 51 undeveloped acres; the other 199 had been developed and all but 6.4 of those acres had been sold. Under their agreement with New Jersey in settlement of its lawsuit, Loveladies could develop only the 12.5 acres of the 51; the development rights in the remaining 38.5 acres were to be dedicated to the state in return for the NJDEP permit.[14] Of the 12.5 acres, one acre was already filled; there remained 11.5 acres of wetlands for which Loveladies sought the § 404 permit. This array of possible denominators bears out the *Lucas* Court's observation that "the rhetorical force of [the] 'deprivation of all economi-

---

12. Over the years, numerous attempts have been made to link takings law with economic theory. *See, e.g.*, William A. Fischel, *Introduction: Utilitarian Balancing and Formalism in Takings*, 88 Col.L.Rev. 1581 (1988); Richard Epstein, Takings: Private Property and the Power of Eminent Domain (1985).

13. In *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), the Court phrased the problem thus:
   Because our test for regulatory taking requires us to compare the value that has been taken from the property with the value that

remains in the property, one of the critical questions is determining how to define the unit of property "whose value is to furnish the denominator of the fraction."
*Id.* at 497, 107 S.Ct. at 1248 (quoting Frank Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of Just Compensation Law*, 80 Harv.L.Rev. 1165, 1192 (1967)) (emphasis supplied).

14. *See supra* note 6 (deed restriction or conservation easement required by permit).

cally feasible use' rule is greater than its precision." *Lucas*, 505 U.S. at —— n. 7, 112 S.Ct. at 2894 n. 7.

Loveladies and the amici urge this court to adopt a brightline rule that the denominator of the takings fraction is that parcel for which the owner seeks a permit. The Government, on the other hand, argues that such bright-line rules would encourage strategic behavior on the part of developers—"conveying away the non-wetlands portions of their parcels prior to applying to the Corps for a permit to fill the remaining wetlands."

Our precedent displays a flexible approach, designed to account for factual nuances. In *Deltona Corp. v. United States*, 657 F.2d 1184, 228 Ct.Cl. 476 (1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982), the court was concerned with whether there remained substantial economically viable uses for plaintiff's property after the regulatory imposition. In determining this, the court took into account the facts that while plaintiffs were blocked from developing two of the three projects for which they sought permits, they were granted a permit for the third; and that within the two that were denied, they had 111 acres of uplands which could be developed, and whose value exceeded by twice the original price paid for the two tracts. There was no taking.

In *Whitney Benefits, Inc. v. United States*, 926 F.2d 1169 (Fed.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991), this court concluded that the regulatory enactment, the Surface Mining Control and Reclamation Act of 1977, had its intended effect, precluding the surface mining of plaintiff's coal field because of the overlying alluvial valley floor. This was based on extensive fact finding by the trial court regarding the purpose of the imposition, the nature of the property, its alternative uses, and the extent to which all or only a portion of plaintiff's property was so limited. "That finding [that the imposition deprived the plaintiff of all economically viable

use of its property and destroyed its value] is not only correct and fully supported by the evidence, it is entitled to respect and may be upset only if it is shown to have been clearly erroneous." *Whitney Benefits*, 926 F.2d at 1172–73. The Claims Court judgment of compensable taking was affirmed.

These factual nuances include consideration of the timing of transfers in light of the developing regulatory environment. New Jersey apparently made no effort to impose restrictions on the development of this wetland area until after the initial project had been approved for development, and until 199 acres had been developed. This development occurred over a substantial period of years beginning in 1958, and involved many kinds of government permits. The trial court concluded that land developed or sold before the regulatory environment existed should not be included in the denominator. The Government has failed to convince us that the trial court clearly erred in this conclusion.[15]

■ With regard to the land remaining after the regulatory fabric was in place, the trial court excluded from consideration the 38.5 acres which for all practical purposes had been promised to New Jersey in exchange for the NJDEP permit. This is only logical since whatever substantial value that land had now belongs to the state and not to Loveladies. It would seem ungrateful in the extreme to require Loveladies to convey to the public the rights in the 38.5 acres in exchange for the right to develop 12.5 acres, and then to include the value of the grant as a charge against the givers.

This leaves the conclusion that the relevant property for the takings analysis is the 12.5 acres, for which the trial court found the remaining value to be de minimis. This is not, then, a case of a partial taking, involving linedrawing between noncompensable 'mere diminution' and compensable partial taking. See *Florida Rock Industries, Inc. v. United*

**15.** For a discussion of some of the policy considerations in determining the relevant denominator, *see* Charles R. Wise, *The Changing Doctrine of Regulatory Taking And The Executive Branch*, 44 Admin.L.Rev. 403, 423–24 (1992). *See also* Patrick Kennedy, Comment, *The United States*

*Claims Court: A Safe "Harbor" from Government Regulation of Privately Owned Wetlands*, 9 Pace Envtl.L.Rev. 723, 744 (1992), for a critical commentary on the trial court's denominator analysis in this case.

*States,* 18 F.3d 1560 (1994). Rather, this is a case in which the owner of the relevant parcel was deprived of all economically feasible use. The trial court's conclusion that the permit denial was effectively a total taking of the property owner's interest in these acres is fully supported in the record; there is no clear error in that conclusion.[16]

### B. The Nuisance Question

■ What remains, then, in light of *Lucas* is consideration of the third criterion—the question of whether, under controlling law, the regulatory imposition goes beyond the Government's powers under common law nuisance doctrine, and thus constitutes a taking. On the facts of this case, we need not examine this question exhaustively, and can leave to another day and to other cases the working out of the full scope of this new requirement. This is for two reasons.

First, the state agreed as a result of negotiations conducted in the shadow of the state law suit that, under its regulatory scheme, Loveladies was entitled to fill the 11.5 acres. Nuisance doctrine has its roots firmly imbedded in equitable principles.[17] It would be inequitable to allow the state, through the medium of the federal permit process, to now exercise authority to prevent the fill, an authority which it publicly acknowledged it either did not have or was unwilling to exercise. Since the federal power to regulate without risk of a taking is based on the state's nuisance law, *see Lucas,* 505 U.S. at ——, 112 S.Ct. at 2901, the federal authority, if exercised, is exercised at the risk of an absence of state authority.

Secondly, the question of whether filling of the 11.5 acres of unfilled wetlands would constitute a nuisance arose at trial. The Government argued that allowing the fill would constitute a nuisance, and that at a minimum this case fell within the so-called *Mugler* rule.[18] *Loveladies 2,* 21 Cl.Ct. at 154 n. 3. The *Mugler* rule and its few progeny created an exception to a citizen's right to compensation for a taking under the Fifth Amendment on the ground that if the activity in which the property owner was engaged was a noxious public nuisance, a law abating that nuisance would not be a taking. The trial court responded to the Government's nuisance defense in part by applying traditional balancing of the property owner's rights against those of the public—viewing the question as a component of the overall balancing issue, the question of whether there is a substantial advancement of a legitimate state interest which outweighs the property interests involved, *see Loveladies 1,* 15 Cl.Ct. at 388–90, especially n. 7—and in part by pointing to the fact that NJDEP, by issuing its permit, had in effect established that there was no nuisance under state law. *See Loveladies 2,* 21 Cl.Ct. at 154 n. 3.

The question of whether, for Fifth Amendment purposes, the state retained the power to impose a particular regulatory framework upon private property owners, as a matter of state property law based on traditional common law nuisance principles, is a somewhat different question from the 'nuisance exception' of *Mugler.* The *Mugler* exception is generally understood to apply, assuming it

---

**16.** Defendant introduced as evidence of residual property value the property's 1982 tax assessment, which was based on a property value of $377,412. While in some cases a sufficiently supported tax assessment might provide evidence of residual value, here the trial court did not accept this evidence "because the court is unable to assess the efficacy of the appraisal of the property at issue." *Loveladies 2,* 21 Cl.Ct. at 157 n. 6. Appellant has not demonstrated that this was clear error. *Compare Miller v. United States,* 223 Ct.Cl. 352, 620 F.2d 812, 827 (1980), *citing United States v. Certain Parcels of Land,* 261 F.2d 287, 290 (4th Cir.1958) (mere opinion of tax assessor as reflected in his assessment, without more, is not admissible as evidence of fair market value).

**17.** *See generally Symposium on Nuisance Law: Twenty Years After Boomer v. Atlantic Cement Co.,* 54 Alb.L.Rev. 171 (1990), and particularly, Jeff L. Lewin, *Boomer and the American Law of Nuisance: Past, Present and Future, id.* at 189.

**18.** *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887) (upholding, against a Fifth Amendment takings challenge, a state temperance law which effectively destroyed plaintiff brewer's business, on the grounds that the legislation furthered the state's interest in protecting the health, safety, and morals of the public). *See, e.g.,* Catherine R. Connors, *Back to the Future: The "Nuisance Exception" to the Just Compensation Clause,* 19 Cap.U.L.Rev. 139 (1990).

retains modern validity,[19] to the extraordinary case in which a particular activity is seen as so offensive to the public sensibility as to warrant no Constitutional protection. The *Lucas* test, on the other hand, is a matter of ascertaining the continuing boundary between private ownership and government reach, and inheres in the title of every piece of property without necessarily being defined with regard to a particular use or activity of the owner.

At trial, in view of the Government's having raised the issue, the scope of nuisance law was explored at some length, and the record contains the parties' developed views on whether the common law of nuisance would justify the denial of the permit to develop the 12.5 acre tract. The trial court concluded that the Government had failed to carry its burden of showing that that law could have been invoked to prevent the fill. Our review of the record leads us to the same conclusion.

It is important to note that Loveladies purchased the property with the intent to develop it long before these particular state and federal regulatory programs came into effect. Furthermore, the state did not include in its original conditions for develop-ment of the property any restrictions on the filling of the 12.5 acres at issue here. The fill restrictions did not arise until long after the development project was undertaken.

In other words, nothing in the state's conduct reflected a considered determination that certain defined activities would violate the state's understanding of its nuisance powers. *Cf. Euclid,* 272 U.S. at 387–88, 47 S.Ct. at 118 ("the law of nuisances ... may be consulted, not for the purpose of controlling, but for the helpful aid of its analogies in the process of ascertaining the scope of, the [police] power.") Nor did Loveladies have the opportunity to decide, at the beginning, whether its investment backed expectations could be realized under the regulatory environment the state later attempted to impose.

### CONCLUSION

For all these reasons, we find that, on the particular facts of this case, no error was committed by the trial judge in determining that a taking occurred when the Federal Government denied the § 404 permit. The judgment of the trial court is

***AFFIRMED.***

---

**19.** *See* Andrew R. Mylott, *Is There A Doctrine In The House?: The Nuisance Exception To The Tak-*ings *Clause Has Been Mortally Wounded By Lucas,* 1992 Wis.L.Rev. 1299.

PLAN OF LOVELADIES HARBOR

ATLANTIC OCEAN

BARNEGAT BAY

51 ACRE UNDEVELOPED TRACT

12.5 ACRES PROPOSED FOR DEVELOPMENT

ORIGINAL 250 ACRE TRACT