530 S.E.2d 628

**Sam B. McQUEEN, Respondent,**

**v.**

**SOUTH CAROLINA COASTAL COUNCIL, n/k/a South Carolina Department of Health and Environmental Control, Office of Ocean and Coastal Resource Management, Petitioner.**

**No. 25108.**

Supreme Court of South Carolina.

Heard Feb. 3, 2000.

Decided April 17, 2000.

Rehearing Denied May 24, 2000.

66

Mary D. Shahid, of South Carolina Department of Health and Environmental Control, Office of Ocean and Coastal Resource Management, of Charleston, for petitioner.

Ronald R. Norton, of Conway, for respondent.

James S. Chandler, Jr., of Pawleys Island, for Amicus Curiae South Carolina Environmental Law Projects.

Glenn Sugameli, of National Wildlife Federation, of Washington, D.C., for Amicus Curiae National Wildlife Federation and South Carolina Wildlife Federation.

BURNETT, Justice:

Petitioner South Carolina Coastal Council [1] appeals the decision of the Court of Appeals holding Coastal Council's denial of permits to bulkhead and fill lots owned by respondent constituted a taking requiring just compensation. *McQueen v. South Carolina Coastal Council*, 329 S.C. 588, 496 S.E.2d 643 (Ct.App.1998). We reverse.

## FACTS

Respondent purchased a lot on 53rd Avenue in the Cherry Grove section of North Myrtle Beach in 1961 for $2500, and a lot on 48th Avenue in 1963 for $1700. Each lot is valued at $22,800 for tax purposes. Both lots are located on manmade, saltwater canals and were created by fill, as were all the lots in the area. Respondent's lots are unimproved, but most of his neighbors' lots have houses and bulkheads constructed on them.

In July 1991, respondent applied to the South Carolina Coastal Council for permits to build bulkheads on his lots to prevent further erosion of his own and his neighbors' property. In January 1992, the Coastal Council issued a permit for the 53rd Avenue lot only, with the condition the bulkhead be constructed 75 feet from the street. Respondent sought a 90–foot setback to comply with the City of North Myrtle Beach's requirements to build on the property. Due to some confusion on the part of the Army Corps of Engineers, which participates in the permitting process, no action was taken on the 48th Avenue lot. The Coastal Council determined the only

1. The South Carolina Coastal Council is now known as the South Carolina Department of Health and Environmental Control, Office of Ocean and Coastal Resource Management. We refer to the agency as the Coastal Council for the sake of consistency with the earlier proceedings in this case.

way to correct the confusion would be to resubmit both applications and begin the review process anew.

Respondent resubmitted the applications to the Coastal Council in 1993. Both permits were denied because the proposed bulkheads were located within the tidelands critical area, so that any backfill would result in filling of tidal wetlands, adversely affecting the environment.

Respondent appealed the denial of the permits, first to the Coastal Council, then to the Coastal Zone Management Appellate Panel. Both bodies upheld the denial of the permits. The Panel found the permits sought by respondent were prohibited by S.C.Code Ann.Regs. 30–12(G)(2)(a) (Supp.1998), which provides that the creation of residential lots for private gain is not justification for filling in wetlands and that permit applications for this purpose should be denied. The Panel further found denial of the permits did not constitute a taking because respondent had no distinct investment-backed expectations, as evidenced by his failure to take action to prevent the erosion of his property.

Respondent appealed the Panel's decision to the circuit court, arguing the permit denials constituted a taking without just compensation. The case was referred to the master-in-equity, who found that by denying respondent the permits, the Coastal Council deprived him of all economically beneficial use of his property, resulting in a taking. Based on respondent's testimony that he had been offered $50,000 for each of the lots, the master found respondent was entitled to $100,000 in compensation. The Coastal Council appealed. A divided Court of Appeals affirmed the master's ruling that respondent suffered a taking, but found insufficient evidence in the record to support the master's determination as to compensation. *McQueen v. South Carolina Coastal Council*, 329 S.C. 588, 496 S.E.2d 643 (Ct.App.1998). The court therefore remanded the issue of just compensation to the circuit court. We granted Coastal Council's petition for certiorari.

## ISSUES

Did Coastal Council's permit denial constitute a "taking" of respondent's property?

A. Do background principles of state law bar respondent from filling his lots?

Is *Carter v. South Carolina Coastal Council* a background principle of state property law?

B. Did respondent have distinct investment-backed expectations entitling him to compensation?

## DISCUSSION

The Fifth Amendment to the United States Constitution provides "private property [shall not] be taken for public use without just compensation." U.S. Const. amend. V. The government "takes" property for public use when it regulates the property in a manner which denies the owner all economically beneficial use of his property. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). In order to recover on a regulatory takings claim, a property owner must establish:

(1) there was a denial of economically viable use of the property as a result of the regulatory imposition;

(2) the property owner had distinct investment-backed expectations; and

(3) the interest taken was vested in the owner, as a matter of state property law, and not within the power of the state to regulate under common law nuisance doctrine.

*Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1179 (Fed.Cir.1994) (restating the law of regulatory takings as defined by cases up to and including *Lucas* ). The Court of Appeals held respondent suffered a "textbook regulatory taking." *McQueen,* 329 S.C. at 600, 496 S.E.2d at 650. We disagree.

It is uncontested the permit denial at issue here deprives respondent of all economically viable use of his property. The questions before this Court are whether respondent had a vested right to backfill his property and whether respondent had investment-backed expectations of developing his property.

Coastal Council contends the Court of Appeals erred in finding the instant case bears "a remarkable similitude" to *Lucas.* David Lucas purchased two coastal tracts in 1986 for

$975,000, with the intent to build single-family homes on them. In 1988, the General Assembly enacted the Beachfront Management Act, S.C.Code Ann. § 48–39–250 et. seq. (Supp. 1998), which had the direct effect of barring Lucas from erecting any permanent habitable structures on his property. *Lucas,* 505 U.S. at 1006–07, 112 S.Ct. 2886. The United States Supreme Court held "[w]here the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." *Id.* at 1027, 112 S.Ct. 2886.

In the instant case, respondent neglected his property for thirty years, allowed the land to revert to wetlands, and now expects the State of South Carolina to pay him the going rate for high ground—a twenty-fold return on his initial investment. We agree with Coastal Council that this case is distinguishable from *Lucas.*

### A. Do background principles of state law bar respondent from filling his lots?

In addressing the third prong of the regulatory takings test, the Court of Appeals majority asked: What rights did respondent possess when he purchased the lots? *McQueen,* 329 S.C. at 599, 496 S.E.2d at 649. The majority assumed, with no citation to authority, "the right to add a bulkhead and fill were [respondent's] at the time of purchase." *Id.* We do not think this is a valid assumption.[2] Nevertheless, we affirm the Court of Appeals' ruling that *Carter v. South Carolina Coastal Council,* 281 S.C. 201, 314 S.E.2d 327 (1984) is not a back-

---

2. Amici Curiae have argued numerous background principles of state law which could conceivably bar a property owner from backfilling wetlands. Most significant among these is the public trust doctrine. In South Carolina, the state owns the property below the high water mark of a navigable stream; this property is part of the public trust. *Sierra Club v. Kiawah Resort Assoc.,* 318 S.C. 119, 456 S.E.2d 397 (1995), *State v. Hardee,* 259 S.C. 535, 193 S.E.2d 497 (1972), *State v. Pacific Guano Co.,* 22 S.C. 50 (1884). The corollary to this principle is the rule that "lands gradually encroached upon by water cease to belong to the former riparian or littoral owner." *Horry County v. Tilghman,* 283 S.C. 475, 478, 322 S.E.2d 831, 833 (Ct.App.1984) (citing *Spigener v. Cooner,* 42 S.C.L. (8 Rich.) 301 (1855)). Because these arguments were not made to the lower courts, and because we reverse on other grounds, we decline to address the application of these principles to respondent.

ground principle of state law that bars respondent from developing his land.

### Is *Carter v. South Carolina Coastal Council* a background principle of state property law?

Coastal Council asserts this case falls into the *Lucas* exception, *i.e.*, the proscribed use interests were not part of respondent's title to begin with. Coastal Council argues that *Carter v. South Carolina Coastal Council*, 281 S.C. 201, 314 S.E.2d 327 (1984), survives *Lucas* and represents a "background principle[ ] of state nuisance and property law that prohibit[s] the uses [respondent] now intends in the circumstances in which the property is presently found." *Lucas*, 505 U.S. at 1031, 112 S.Ct. 2886. We disagree.

In *Carter*, we held denial of a permit to fill 5.3 acres of wetlands was not a taking because "[a]n owner of land has no absolute and unlimited right to change the natural character of his land so as to use it for a purpose for which it was unsuited in its natural state and which injures the rights of others." *Id.* at 205, 314 S.E.2d at 329. We concluded the permit denial there was a valid exercise of the State's police power to prevent public harm. *Id.* at 204–05, 314 S.E.2d at 329.

*Carter* followed the landmark decision of *Just v. Marinette County*, 56 Wis.2d 7, 201 N.W.2d 761 (1972). Commentators are divided on whether the principle stated in *Just* (there is no absolute right to change the natural character of land) is a background principle of state property law that can be used as a basis for denying wetlands takings claims after *Lucas*. *See, e.g.*, Hope M. Babcock, Has the U.S. Supreme Court Finally Drained the Swamp of Takings Jurisprudence?: The Impact of Lucas v. South Carolina Coastal Council on Wetlands and Coastal Barrier Beaches, 19 Harv.Envtl.L.Rev. 1, 46 & n. 260 (1995) (*Just* is a background principle), Jan Goldman–Carter, Protecting Wetlands and Reasonable Investment–Backed Expectations in the Wake of Lucas v. South Carolina Coastal Council, 28 Land & Water L.Rev. 425, 447 & n. 138. (1993) (same) [3]; *but see* Joseph L. Sax, Property Rights & the

---

**3.** Commentators asserting *Just* is a background principle of state law express the principle in terms of the public trust doctrine, although neither *Just* nor *Carter* uses that term. *See supra* n. 2.

Economy of Nature: Understanding Lucas v. South Carolina Coastal Council, 45 Stan.L.Rev. 1433, 1440 (1993) (arguing the *Lucas* Court "repudiat[ed] the conclusion of *Just* "), Richard Ausness, Regulatory Taking & Wetland Protection in the Post–Lucas Era, 30 Land & Water L.Rev. 349, 403–04 (1995) ("*Lucas* is inconsistent with the reasoning of *Just v. Marinette County* and other cases that concluded that property owners have no inherent right to change the "natural" character of their land.") (citing *Carter, inter alia* ).

Thus, the question before us is whether the rule articulated in *Carter* is a background principle of state property law that survives *Lucas*.[4] Our opinion in the first *Lucas* decision suggests the fate of *Carter* on the takings issue is inextricably linked to the outcome of the *Lucas* case. *Lucas v. South Carolina Coastal Council,* 304 S.C. 376, 388, 404 S.E.2d 895, 901 (1991) (*Lucas I* ), *reversed,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) ("To adopt Lucas' argument would therefore be to overrule *Carter.*"). However, the dissent in *Lucas I* did not find *Carter* controlling, and would have found a taking without overruling *Carter. Id.* at n. 4 (Harwell, J. dissenting). Moreover, the issue in *Carter* (and in this case), was not before the Court in *Lucas* because David Lucas sought to build on high ground; there was therefore no question he had that right prior to enactment of the Beachfront Management Act. *See Lucas v. South Carolina Coastal*

---

4. No other court of record has yet squarely addressed the question whether *Just* is a background principle of state law. One court suggested it is in dicta. *See City of Riviera Beach v. Shillingburg,* 659 So.2d 1174, 1183 (Fla.Dist.Ct.App.1995) (dismissing takings claim on ripeness grounds, but citing *Just* principle post-*Lucas* ); *see also Zealy v. City of Waukesha,* 201 Wis. 2d 365, 548 N.W.2d 528, 534 (1996) (finding no taking on other grounds, and declining to reach issue of whether *Just* is a *Lucas* background principle, but specifically noting that "[n]othing in this opinion limits our holding in *Just* and cases following its rule"), *Good v. United States,* 39 Fed.Cl. 81, 98 & n. 30 (1997) *aff'd* 189 F.3d 1355 (1999) (noting status of *Just* line of cases as a background principle of state law is unclear). We also note that Justice Blackmun's dissent in *Lucas* cites *Just* for the proposition that the majority erred in finding a "clear and accepted 'historical compact' or 'understanding of our citizens' justifying the Court's new takings doctrine." 505 U.S. at 1059–60, 112 S.Ct. 2886 (Blackmun, J., dissenting). Blackmun's dissent suggests he believed the majority's reasoning was flawed in light of *Just* (and other sources), not that he thought *Just* fell into the exception carved out by the majority for background principles of state law.

*Council,* 309 S.C. 424, 424 S.E.2d 484 (1992) (*Lucas II* ) (no common law basis exists by which State could restrain Lucas' desired use of his land).

We conclude *Carter* was overruled in part by the United States Supreme Court's *Lucas* decision.[5] While not specifically addressing the holding of *Just,* the United States Supreme Court repudiated the reasoning of *Just* in *Lucas:*

> [R]egulations that leave the owner of land without economically beneficial or productive options for its use—typically, as here, *by requiring land to be left substantially in its natural state* —carry with them a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm.

*Lucas,* 505 U.S. at 1018, 112 S.Ct. 2886 (emphasis added). The *Lucas* decision made clear the State "must do more than proffer . . . the conclusory assertion that [the uses respondent desires] violate a common-law maxim such as *sic utere tuo ut alienum non laedas.*" [6] *Lucas,* 505 U.S. at 1031, 112 S.Ct. 2886. Furthermore, the Supreme Court explicitly rejected the State's police power justification for denying compensation. *Id.* at 1026, 112 S.Ct. 2886. We agree with the Court of Appeals that the United States Supreme Court overruled *Carter* on the takings issue in *Lucas.* *McQueen,* 329 S.C. at 597, 496 S.E.2d at 648.

B. Did respondent have distinct investment-backed expectations entitling him to compensation?

■ Coastal Council argues the Court of Appeals erred in refusing to consider its factual argument that respondent knew his lots were eroding for some time and failed to take measures to protect his property. We agree. Coastal Council was not arguing to the Court of Appeals that respondent had a legal duty to prevent the erosion of his property. Rather, this factual argument was intended to distinguish the case at bar from *Lucas* and to demonstrate a lack of investment-backed

5. This conclusion does not affect the validity of *Carter* on the issue of the substantial evidence standard of review. *See* 281 S.C. at 202–04, 314 S.E.2d at 328–29.

6. "Use your own property in such a manner as not to injure that of another." Black's Law Dictionary 1380 (6th ed.1990).

expectations. The Court of Appeals erred in failing to address this second prong of the regulatory takings test.

In order to recover on a takings claim, a property owner must establish the regulation interfered with his distinct, investment-backed expectations. *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1179 (Fed.Cir.1994), *Mibbs v. South Carolina Dep't of Revenue*, 337 S.C. 601, 524 S.E.2d 626 (1999). Without the requirement of investment-backed expectations, a property owner could obtain a windfall by claiming a taking in the face of new regulations, without any real intent to develop. This issue was not discussed in *Lucas* as there was no question David Lucas had distinct investment-backed expectations. *See Loveladies Harbor*, 28 F.3d at 1178. Nor was the issue disputed in *Loveladies Harbor. Id.* at 1179. However, several recent decisions have found no taking based on the property owner's lack of investment-backed expectations.

The most recent and similar of these decisions is *Good v. United States*, 189 F.3d 1355 (Fed.Cir.1999). Good purchased wetlands property in the Florida Keys in 1973. In 1980, he hired a land planning and development firm to obtain the federal, state, and local permits required to develop the property. In March 1981, he submitted his first permit application to the Army Corps of Engineers. The Corps granted the permit in May 1983. Good then modified the permit in response to county environmental concerns. The Corps issued a modified permit in January 1984. The permits were good for five years. *Id.* at 1357.

Good was meanwhile pursuing the required state and local permits. In February 1983, the state issued a permit conditioned on Good obtaining county approval. In May 1983, Good applied for county approval. After some wrangling over the standard of review, the county granted approval in July 1984. *Id.*

Having obtained federal, state, and county permits, Good next had to obtain review by the Florida Department of Community Affairs, pursuant to the state's Environmental Land and Water Management Act, Fla.Stat.Ann. §§ 380.012 to 380.12 (West 1997). The statute provided for the Depart-

ment of Community Affairs to review local land development orders in Areas of Critical State Concern. The Department could appeal objectionable orders to the Florida Land and Water Adjudicatory Commission. The Department appealed the county's approval and the Commission held the county had applied the wrong standard of review and ordered the county to re-review the project under a stricter standard. *Id.* at 1358.

In the meantime, the county had adopted a new land use plan and new development regulations. Good's project would not have been allowed under the new regulations. Good sued the state alleging a taking. That suit was settled and the consent order provided for evaluation of Good's application under the old regulations. *Id.*

By this time, Good's federal permits had almost expired. The Corps denied Good's request for an extension, but did grant new permits in October 1988 allowing substantially the same development. In November, the county gave preliminary approval to Good's plan. Final approval was subject to fifteen conditions, including approval by the South Florida Water Management District. Good applied with the Water Management District and a few months later, received notification that its staff recommended denial of the application based on "the unmitigated loss of wetlands." Good withdrew his application with the Water Management District. *Id.*

In July 1990, Good submitted a new, scaled-down plan to the Corps. Between the time the Corps issued Good's 1988 permit and the time he applied for the 1990 permit, the Lower Keys marsh rabbit was listed as an endangered species. The Corps was therefore required to consult with the Fish and Wildlife Service to make sure the requested permit would not jeopardize the marsh rabbit. The Fish and Wildlife Service concluded Good's project would not jeopardize the marsh rabbit, but nonetheless recommended denial of the permit based on the plan's overall environmental impact. *Id.* at 1368–69.

Subsequently, the silver rice rat was listed as an endangered species. In December 1991, the Fish and Wildlife Service issued a new recommendation that the Corps deny Good's 1990 application because the development threatened

both the Lower Keys marsh rabbit and the silver rice rat. The Corps denied Good's 1990 permit application in March 1994 and informed Good his 1988 permit had expired. *Id.* at 1369.

Good sued the federal government alleging a taking of property without just compensation. He argued the permit requirements of the Rivers and Harbors Act, 33 U.S.C. § 403 (1994), and the Clean Water Act, 33 U.S.C § 1344 (1994), were irrelevant to his reasonable expectations at the time he purchased the property because he obtained the federal dredge-and-fill permits required by those acts three times and was only denied a permit based on the Endangered Species Act, 16 U.S.C. § 1531 et seq. (1994), which did not exist when he bought his land. The court, while acknowledging the reasonableness of Good's argument, ultimately rejected it. It noted Good purchased the property with knowledge that it might be difficult to obtain approval for his project, then waited seven years, "watching as the applicable regulations got more stringent, before taking any steps to obtain the required approval." *Id.* at 1361–62. The court stated that "[w]hile [Good's] prolonged inaction does not bar his takings claim, it reduces his ability to fairly claim surprise when his permit application was denied." *Id.* at 1363. The court concluded Good "lacked the reasonable, investment-backed expectations that are necessary to establish that a government action effects a regulatory taking." *Id.*

While *Good* is distinguishable from the instant case in various respects, the principle it articulates applies with equal force here. Respondent purchased beachfront property that has been the subject of at least some developmental regulation for over a century. *See, e.g.,* The Rivers & Harbors Act of 1899, 33 U.S.C. § 403 (1994) (requiring a permit from the Army Corps of Engineers to develop wetlands). This pre-existing permit requirement is relevant to respondent's investment-backed expectations. *Forest Properties, Inc. v. United States,* 39 Fed.Cl. 56, 75–76 (1997). His prolonged neglect of the property and failure to seek developmental permits in the face of ever more stringent regulations demonstrate a distinct lack of investment-backed expectations.

## CONCLUSION

The Court of Appeals affirmed the denial of respondent's permit applications because the land he seeks to fill is protected wetlands. The only question before this Court is whether the denial of those permits constitutes a taking of property without just compensation. Because respondent has failed to demonstrate the distinct investment-backed expectations required to find a taking, we **REVERSE.**

TOAL, Acting C.J., MOORE, WALLER, JJ., and Acting Justice R. MARKLEY DENNIS, Jr., concur.