## 24302

J. Kirkland GRANT, Appellant v.
SOUTH CAROLINA COASTAL COUNCIL, Respondent.

(461 S.E. (2d) 388)

Supreme Court

J. *Kirkland Grant,* Folly Beach, *pro se.*

*Mary Duncan Shahid, Office of Ocean and Coastal Resource Management (formerly South Carolina Coastal Council)* and *Staff Atty. John P. Kassebaum, II of S.C. Dept. of Health & Environmental Control, Office of Ocean and Coastal Resource Management (formerly South Carolina Coastal Council),* Charleston, *for respondent.*

Heard Apr. 19, 1995.

Decided Aug. 21, 1995.

TOAL, Justice:

This is an appeal of a circuit court's affirmance of a ruling by the South Carolina Coastal Council (Coastal Council) that the

Appellant, J. Kirkland Grant (Grant), violated S.C. Code Ann. § 48-39-130(C) by filling critical area tidelands without a permit. We affirm.

## FACTS

In 1987, Grant purchased approximately ten acres of land on Folly Beach, South Carolina, in the area on the northern side of Ashley Avenue locally known as the "washout area." He built a small single-family residence on the property. The balance of the property consisted of a dune field along the frontage of his property, behind which was located a marsh (also referred to as Overwash Area). Because the marsh constituted critical area tidelands as defined by S.C. Code Ann. § 48-39-10(G) (Supp. 1994), the South Carolina Coastal Council regulated Grant's use of it, forbidding, *inter alia*, dredging or filling the marsh without a permit. *See* S.C. Code Ann. § 48-39-130(C) (Supp. 1994).

On September 21, 1989, Hurricane Hugo struck Folly Beach, washing out Ashley Avenue along the entire frontage of Grant's property and causing sand to overwash the property. The sand covered approximately 200 feet of tidelands along the entire length of Grant's property (the Overwash Area). Until Ashley Avenue was reconstructed in its original location, the Overwash Area was used as a temporary access road to the eastern end of Folly Beach and as a staging area for reconstruction of Ashley Avenue.

In July, 1990, Grant hired a contractor to haul fill material into the Overwash Area. Although he obtained a local permit from the City of Folly Beach, Grant did not notify the Coastal Council of his intention to fill the Overwash Area. In August 1990, an agent of the Coastal Council discovered the filling activity and cited Grant for violating the Coastal Zone Management Act (the Act), S.C. Code Ann. §§ 48-39-10 *et seq.* (1987 & Supp. 1994), by filling critical areas without a permit. After a hearing conducted by a Coastal Council hearing officer, the Coastal Council issued an Administrative Order finding Grant in violation of the Act. The basis for the Administrative Order was the finding that the Overwash Area remained critical area immediately after Hurricane Hugo. The hearing officer also determined that the Coastal Council had jurisdiction to issue the Administrative Order and that its issuance did not

violate Grant's right to equal protection on constitute a regulatory taking.

Grant subsequently appealed the decision of the hearing officer to the full Council, arguing primarily that the sand from Hurricane Hugo elevated the tidelands on his land to such a level as to remove it from the critical area classification. Grant acknowledged that the Overwash Area was below the critical area level when the agent for the Coastal Council issued the citation, but contended that federal and state governmental entities had removed sand from his property to rebuild Ashley Avenue. Grant also raised his equal protection, jurisdictional, and takings clause arguments. The Coastal Council affirmed the decision of the hearing officer.

Grant appealed the decision of the full Council to the circuit court. Grant first argued that S.C. Code Ann. § 48-39-180 (1987) gave him a right to *de novo* review by the circuit court. Grant also argued that even if *de novo* review was inappropriate, the decision of the Coastal Council was not supported by substantial evidence, effected a taking without just compensation, and violated his right to equal protection. Finally, Grant contended that the Coastal Council lacked jurisdiction to issue its Administrative Oder, because the Overwash Area did not constitute jurisdictional critical area.

The circuit court rejected each of Grant's arguments and affirmed the decision of the Coastal Council. Grant appeals.

## LAW/ANALYSIS

A. *Substantial Evidence Review of Critical Area Determination*

Grant first argues there was not substantial evidence to support the Coastal Council's ruling that the Overwash Area was critical area tidelands[1] immediately after Hurricane Hugo. Although Grant admits that area was

---

[1] S.C. Code Ann. § 48-39-10(J) (Supp. 1994) incudes tidelands within its definition of "critical areas." S.C. Code Ann. § 48-39-19(G) (Supp. 1994) defines tidelands as

all areas which are at or below mean high tide and coastal wetlands, mudflats, and similar areas that are contiguous or adjacent to coastal waters and are an integral part of the estuarine systems involved. Coastal wetlands include marshes, mudflats, and shallows and means those areas peri-

critical area when he began filling, he contends the sand from Hurricane Hugo elevated the Overwash Area above the critical area mark, but federal and state governmental entities later removed much of this sand from his property.

The testimony before the Coastal Council hearing officer was conflicting. A Coastal Council engineer testified that the areas on Grant's property with elevations below 5.5 feet NGVD (National Geodetic Vertical Data) were critical areas, but areas with elevations above 5.5 feet were noncritical areas. The engineer then testified that he had determined that based on pre-Hugo profiles of the elevation of Grant's Overwash Area, Hurricane Hugo would have had to deposit approximately 193,000 cubic feet of sand on that area to raise the elevation above the critical area mark. According to his testimony, the beach was the only potential source of sand for overwash on Grant's marshland from Hugo. The engineer's calculations of the amount of sand available on the beach before Hugo indicated that particular area of beach contained only 93,000 cubic feet of sand, less than half the amount needed to elevate the Overwash Area above 5.5 feet. Therefore, the engineer concluded that the hurricane could not have elevated the Overwash Area above the critical area mark. The engineer verified his conclusion by calculating the elevation of sand on certain areas of Grant's land where no now had disturbed the land after the hurricane. These calculations were consistent with his other findings.

Grant presented testimony by both a staff geologist employed by the Coastal Council and a tenant who rented a residence on Grant's property. These witnesses indicated that shortly after Hurricane Hugo, the sand on the Overwash Area was deep enough to support storm vehicles traveling on the property. The tenant also testified that before any governmental entity removed any land from the property, the sand on Grant's property was elevated approximately two feet and no marsh or other vegetation was visible on the property. The same witness testified that when he visited the property later, the sand he had seen on his first visit after the hurricane had

odically inundated by saline whether or not the saline waters reach the area naturally or through artificial water courses and those areas ath are normally characterized by the prevalence of saline water vegetation capable of growth and reproduction.

been displaced. The Coastal Council geologist testified it appeared Hurricane Hugo had washed enough sand on Grant's property to change the critical area line.

■ Our review of this issue is governed by the substantial evidence standard.[2] *See, e.g., Hamm v. South Carolina Public Service Comm'n*, 309 S.C. 295, 422 S.E. (2d) 118 (1992) (under APA, court must sustain agency decision if there is substantial evidence to support the decision). The "possibility of drawing two inconsistent conclusions from the evidence does not prevent an Administrative Agency's finding from being supported by substantial evidence." *Palmetto Alliance, Inc. v. South Carolina Public Service Commission*, 282 S.C. 430, 432, 319 S.E. (2d) 695, 696 (1984). Rather, we need only find, considering the record as a whole, evidence that "would allow reasonable minds to reach the conclusion that the administrative agency reached." *Carter v. South Carolina Coastal Council*, 281 S.C. 201, 203, 314 S.E. (2d) 327, 328 (1984) (citation omitted). Furthermore, neither we nor the circuit court may substitute our judgment for that of the agency as to the weight of the evidence on question of fact. *See, e.g., Gibson v. Florence Country Club*, 282 S.C. 384, 318 S.E. (2d) 365 (1984). Although the evidence contained in the Record is conflicting, the evidence supporting the Coastal Council's ruling on this issue clearly surpasses the substantial evidence threshold. For that reason, the circuit court correctly affirmed the Coastal Council's decision that Grant filled critical area tidelands without a permit.

B. *Takings Clause*

■ Grant next argues the Coastal Council's action forbidding him from filling the Overwash Area constitutes a regulatory taking requiring compensation. We disagree.

In *Lucas v. South Carolina Coastal Council*, — U.S. —, 112 S.Ct. 2886, 120 L.Ed. (2d) 798 (1992), the United States

---

[2] Grant's argument that S.C. Code Ann. § 48-39-180 (1987) required the circuit court to conduct a *de novo* review is without merit. Section 48-39-180 (1987) required the circuit court to conduct a *de nova* review is without merit. Section 48-39-180 expressly applies only to persons who have *actually applied* for a permit or those adversely affected by an *existing* permit. As Grant admits he never applied for a Coastal Council permit, section 48-39-180 does not apply in this case.

Supreme Court defined the parameters of the Fifth and Fourteenth Amendment Takings Clauses, delineating the circumstances under which a statute or regulation effects a compensable taking of property. That decision expressly states no compensable taking occurs when the complained-of restriction on use was part of the owner's original title:

> Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation *only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with.*

*Lucas* —, U.S. at —, 112 S.Ct. at 2899, 120 L.Ed. (2d) at 820.

Grant has *never* had the right to fill critical area tidelands on his Folly Beach property. In 1987, when Grant purchased the Folly Beach property, South Carolina law forbade his filling critical areas without a permit from the Coastal Council. *See* S.C. Code Ann. § 48-39-130(C) (Supp. 1994) (original version of statute enacted in 1977). Grant admits the Overwash Area was definitional critical area tidelands when he purchased the property. As stated above, the area remained critical area immediately after the hurricane. Therefore, after Hugo, Grant's right to use his property did not alter from when he originally acquired title to it. Accordingly, no taking has occurred. *See Lucas,* — U.S. —, 112 S.Ct. 2886, 120 L.Ed. (2d) 798 (1992).

C. *Equal Protection*

Grant next asserts the Coastal Council deprived him of his Fourteenth Amendment[3] right to equal protection by forbidding him form filling property on his land but allowing his neighbors and others to fill their land. We find no violation of equal protection.

The *sine qua non* of an equal protection claim is a showing that similarly situated persons received disparate treatment. *See, e.g., Weaver v. South Carolina Coastal Council,* 309 S.C. 368, 423 S.E. (2d) 340 (1992). Grant failed to meet his burden of demonstrating that he was treated differently from other *similarly situated* landowners.

---

[3] U.S. Const. amend XIV.

Grant presented evidence that the Coastal Council allowed his next-door neighbor to fill his property after Hurricane Hugo and allowed the County to place fill in an area of the County park that, like Grant's Overwash Area, had been critical area pre-Hugo. However, other evidence demonstrated the areas filled by the County and by Grant's neighbor were different from the Overwash Area of Grant's property. One of Grant's own witnesses testified that the elevation of that neighbor's land was *higher* than that on Grant's property. A higher elevation would justify the coastal Council's allowing that landowner to place fill on his property. In relation to the park, both a scientist for the Coastal Council and a Coastal Council engineer testified that the engineer had been able to determine scientifically that the area filled by the County was no longer critical area after the hurricane. In light of this evidence, we agree with the circuit court that Grant did not prove the Coastal Council treated him differently from other similarly situated landowners. Accordingly, we find no equal protection violation.

D. *Jurisdiction*

Grant argues that S.C. Code Ann. § 48-39-200 (1987)[4] limits the jurisdiction of the Coastal Council to "critical areas," and that because the Overwash Area was not a critical area, the Coastal Council lacked jurisdiction over Grant. This argument ignores the finding that the area *was* critical area subject to Coastal Council jurisdiction. For that reason alone, Grant's jurisdictional argument is without merit. Furthermore, although former section 48-39-200 restricted the Coastal Council's direct regulatory authority to critical areas, it did not restrict its authority to determine whether a specific area constitutes definitional critical area.

E. *Other Issues*

Grant complains the circuit court signed its Order prepared by opposing counsel before Grant was given an opportunity to review it and object to its contents.

---

[4] Section 48-39-200 (1987), which was replaced in 1993, provided:

Notwithstanding any other provisions of this chapter, the Council shall have no direct regulatory authority over area outside the critical areas in the coastal zone.

Grant failed to move under Rule 59(e), SCRCP, to alter or amend the judgment. Having failed to avail himself of his initial remedy, Grant will not now be heard to complain that the Order is inaccurate or prejudicial.[5] *See, e.g., Murphy v. Hagan,* 275 S.C. 334, 271 S.E. (2d) 311 (1980) (appellate court will not hear issues not raised or preserved in lower court proceeding).

Finally, Grant argues that the Coastal Council hearing was conducted in such a way as to deprive him of his constitutional due process rights. This appeal is Grant's first mention of any deprivation of due process and, therefore, this issue is not preserved. *See id.*

Based upon all the foregoing reasons, the ruling of the circuit court is accordingly AFFIRMED.

FINNEY, C.J., MOORE and WALLER, JJ., and A. LEE CHANDLER, Acting Associate Justice, concur.

---

[5] Moreover, even if Grant had preserved this issue, this Court held in *Burgess v. Stern,* 311 S.C. 326, 428 S.E. (2d) 880, *cert denied,* — U.S. —, 114 S.Ct. 186, 126 L.Ed. (2d) 145 (1993), that *ex parte* communications do not constitute grounds to reverse court orders unless the record reflects partiality or prejudice. Here, as the record reflects neither partiality nor prejudice, the *ex parte* communication resulting from the circuit court's signing an order drafted by opposing counsel but not sent to Grant does not constitute reversible error.