**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

CLYDE A. ELTZROTH; RANDOLPH
MURDAUGH, JR.; NATIONSBANK OF
SOUTH CAROLINA, N.A., as Personal
Representative of the Estate of
Henry H. Edens, deceased,
Defendants-Appellants,

No. 97-1160

STATE OF GEORGIA,
Defendant-Appellee,

and

465 ACRES OF LAND, MORE OR LESS,
SITUATED IN JASPER COUNTY, STATE OF
SOUTH CAROLINA; TAX ASSESSOR OF
JASPER COUNTY; UNKNOWN OWNERS,
Defendants.

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
David C. Norton, District Judge.
(CA-94-2335)

Argued: July 14, 1997

Decided: September 4, 1997

Before MURNAGHAN, Circuit Judge,
PHILLIPS, Senior Circuit Judge, and BRITT,
United States District Judge for the
Eastern District of North Carolina, sitting by designation.

_____

Reversed and remanded by published opinion. Judge Murnaghan wrote the opinion, in which Senior Judge Phillips and Judge Britt joined.

_____

**COUNSEL**

**ARGUED:** Thomas English McCutchen, Jr., MCCUTCHEN, BLANTON, RHODES & JOHNSON, Columbia, South Carolina, for Appellants. John Harris Douglas, Assistant United States Attorney, Charleston, South Carolina; James S.S. Howell, Special Assistant Attorney General, Atlanta, Georgia, for Appellees. **ON BRIEF:** Jeter E. Rhodes, Jr., MCCUTCHEN, BLANTON, RHODES & JOHNSON, Columbia, South Carolina, for Appellants.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Plaintiffs-Appellants Clyde Eltzroth, Randolph Murdaugh, Jr., and NationsBank of South Carolina (collectively, the "Landowners") own land on Barnwell Island (the "Island" or the "Property"), which sits in the Savannah River. South Carolina deeded the Property to the Landowners' predecessor in interest in 1942. In the 1950s, the United States Army Corps of Engineers (the "Government") began dredging the Savannah harbor, and it wanted to deposit the dredged material, known as "spoil," on the Island. After the Government instituted condemnation proceedings to obtain a perpetual easement over the Property, the United States Court of Appeals for the Fifth Circuit held that the Island actually fell within the boundaries of Georgia, not in South Carolina. The court subsequently determined that the Landowners did not have valid title to the Property from South Carolina, and Georgia granted a perpetual easement to the Government to deposit spoil on the Island (the "Georgia Easement").

In 1990, in an unrelated case, the United States Supreme Court held that the Island belongs to South Carolina, not Georgia. The United States District Court for the District of South Carolina subse-

2

quently declared the Georgia Easement invalid. The Government then filed the instant action to have the Property condemned. An issue arose, however, regarding the date of the Government's "taking," and thus the proper date for determining the market value of the Property. The Government contends that the taking occurred on March 9, 1956 when it entered into physical possession of the Property pursuant to the Georgia Easement, and it therefore argues that the Landowners should receive compensation for the market value of the Property on March 9, 1956. The Landowners, however, contend that the taking did not occur until August 30, 1994 when the Government filed the instant condemnation action and that they should receive compensation for the market value of the Property on that date. The district court adopted the Government's position and held that the Government took the Property in fee simple on March 9, 1956. For the reasons stated below, we reverse and remand the district court's judgment. Although the Government did take an easement in the Property on March 9, 1956, we conclude that it did not take the remaining interest in the Property, the fee simple subject to an easement, until August 30, 1994.

I.

In 1787, Georgia and South Carolina signed the Treaty of Beaufort (the "Treaty"). The Treaty defined the boundary between the two states, and it reserved all of the islands in the Savannah River to Georgia. The legislatures of each state and the Continental Congress ratified the Treaty in due course. See Georgia v. South Carolina, 497 U.S. 376, 380-81 (1990). Nonetheless, in 1940, the sheriff of Beaufort County, South Carolina conveyed one such island, Barnwell Island, to the Beaufort County Forfeited Land Commission (the "Commission") because the Barnwells failed to pay property taxes that Beaufort County had assessed. In 1942, South Carolina, through the Commission, deeded Barnwell Island[1] to Eustace Pinckney.

_____

[1] The parties sometimes refer to the Property at issue as the "Barnwell Islands." However, natural forces and the spoil deposits have converted the separate islands into a continuous piece of land attached to the South Carolina shore.

3

In 1952, the Government filed a condemnation action in the United States District Court for the Southern District of Georgia to obtain a perpetual easement over the Island to deposit spoil from the Savannah harbor. The district court dismissed the action for lack of jurisdiction because it found that the Island fell within South Carolina's boundaries due to prescription and Georgia's acquiescence to South Carolina's exercise of sovereignty over the Island. Georgia intervened and claimed sovereignty to the Island based on the Treaty. The United States Court of Appeals for the Fifth Circuit reversed. Relying on the Treaty, the Fifth Circuit held that the Island fell within Georgia's border, and it remanded the case to the district court for further proceedings. See United States v. 450 Acres of Land, 220 F.2d 353 (5th Cir. 1955).

During the interim, the Government entered into possession of an easement on the Island pursuant to an April 3, 1953 district court order that granted immediate possession to the Government under the Rivers and Harbors Appropriation Act of 1918, 33 U.S.C.A. § 594 (West 1986).**2** On March 9, 1956, after the Fifth Circuit held that the Island belonged to Georgia, Georgia deeded a perpetual easement over the Island to the Government for spoil disposal. In 1957, on remand from the Fifth Circuit, the district court dismissed Pinckney as an improperly joined party on the ground that South Carolina did not pass good title to him in 1942 since the Property actually fell within Georgia's borders. The Government subsequently dismissed

_____

**2** Section 594 provides in pertinent part:

> Whenever the Secretary of the Army, in pursuance of authority conferred on him by law, causes proceedings to be instituted in the name of the United States for the acquirement by condemnation of any lands, easements, or rights of way needed for a work of river and harbor improvements duly authorized by Congress, the United States, upon the filing of the petition in any such proceedings, shall have the right to take immediate possession of said lands, easements, or rights of way, to the extent of the interest to be acquired, and proceed with such public works thereon as have been authorized by Congress: Provided, That certain and adequate provision shall have been made for the payment of just compensation to the party or parties entitled thereto.

33 U.S.C.A. § 594 (emphasis added).

4

the condemnation action because it had obtained the perpetual Georgia Easement, the interest that it sought in the condemnation action, and it began to deposit spoil on the Island. In 1960, Pinckney quitclaimed whatever interest he held in the Property to the Landowners.

In an unrelated case, Georgia sued South Carolina in 1977 after a long dispute between the two states over the exact location of their boundary along the lower Savannah River. In 1990, the United States Supreme Court determined the location of the boundary, and it held that the Island belongs to South Carolina. The Court concluded that South Carolina acquired sovereignty over the Island by prescription and acquiescence, as evidenced by its taxation, policing, and patrolling of the Island. See Georgia v. South Carolina, 497 U.S. 376, 388-93 (1990).

In 1991, the Landowners filed a quiet-title action in the United States District Court for the District of South Carolina to divest the Government of the Georgia Easement. The district court concluded that South Carolina exercised sovereignty over the Island on the date of the Georgia Easement and that the Government therefore never acquired a valid easement because Georgia did not have the right to convey such an interest. Accordingly, the court invalidated the Georgia Easement. See Eltzroth v. United States, C.A. No. 2:91-2139-18 (D.S.C. Feb. 25, 1994). The Government initially appealed the district court's order to the Fourth Circuit, but it later dismissed the appeal.

On August 30, 1994, the Government filed the instant condemnation action for the entire fee simple absolute in the United States District Court for the District of South Carolina. The Government named the Landowners and Georgia as defendants. On September 11, 1995, the district court dismissed Georgia as a party defendant because it held that Georgia had no claim or interest in the Island due to its sovereignty or to adverse possession. On October 23, 1995, the district court granted the Government's motion to join Georgia as a party plaintiff on the ground that Georgia will have to pay any compensation owed to the Landowners for the condemnation. [3]

_____

[3] Pursuant to the Rivers and Harbors Appropriation Act of 1917, 33 U.S.C.A. § 593 (West 1986), the Government may institute condemnation proceedings to acquire land that a state needs in connection with a river and harbor improvement authorized by Congress, but the state must pay the expense of the proceedings and any award granted to the landowner.

5

Before the Government obtained the Georgia Easement in 1956, it consisted mainly of marshlands. However, the spoil that the Government deposited created dry land on the Island, and the Island's market value has greatly increased since 1956. The district court therefore asked the parties to brief the valuation issue. The Government and Georgia contended that the taking of the entire fee simple occurred on March 9, 1956 when the Government entered into physical possession of the Property pursuant to the Georgia Easement, and they therefore argued that the court should value the Property as of that date. The Landowners argued that the taking of the fee simple occurred on August 30, 1994 when the Government filed the instant condemnation action and that the court should value the Property as of that date. On August 27, 1996, the district court held that the taking of the fee simple absolute occurred on March 9, 1956.

On October 18, 1996, the district court denied the Landowners' motion for reconsideration. On December 9, 1996, the district court amended its orders and certified the issue to the Fourth Circuit pursuant to 28 U.S.C.A. § 1292(b) (West 1993). **4** On February 5, 1997, we granted the Landowners' petition for permission to appeal the district court's interlocutory order.

II.

The Fifth Amendment of the United States Constitution provides: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Landowners in the instant case contend that the district court erred in holding that the Government "took" a fee simple absolute in the Property on March 9, 1956. In our view, the appeal involves two separate questions: 1) whether a taking occurred on March 9, 1956; and 2) if so, what interest the Government took in the Property on that date. We review such questions of

_____

**4** Section 1292(b) gives the courts of appeals discretion to permit interlocutory appeals from district court orders when the district judge is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C.A. § 1292(b).

6

law de novo. See Watson v. Lowcountry Red Cross, 974 F.2d 482, 485 (4th Cir. 1992). We address each question in turn below.

A.

We first must determine whether a taking occurred on March 9, 1956 when the Government first possessed the Property pursuant to the Georgia Easement. Based on the Supreme Court's holding in United States v. Dow, 357 U.S. 17 (1958), we conclude that a taking of at least some interest in the Property did occur on March 9, 1956.

In Dow, the Supreme Court discussed the proper method for determining the date of a taking. In that case, the Government had seized a pipeline easement over private property in 1943 pursuant to a court order for immediate possession of the easement under the Second War Powers Act of March 27, 1942, 56 Stat. 176, 177. See Dow, 357 U.S. at 18-19. The Government filed a declaration of taking in 1946 for the easement pursuant to the Declaration of Taking Act (the "Taking Act"), 40 U.S.C.A. § 258a-258e (West 1986 & Supp. 1997), and it deposited the estimated just compensation with the court at that time. Id. at 19.

The Dow Court held that the Government can take property pursuant to its eminent domain power in either of two ways: 1) by physically entering and appropriating the property for public use without a court order; or 2) by instituting condemnation proceedings under various federal statutes that authorize such takings. See Dow, 357 U.S. at 21. The Court stated:

> Although in both classes of "taking" cases-- condemnation and physical seizure -- title to the property passes to the Government only when the owner receives compensation, or when the compensation is deposited into court pursuant to the Taking Act, the passage of title does not necessarily determine the date of "taking." The usual rule is that if the United States has entered into possession of the property prior to the acquisition of title, it is the former event which constitutes the act of taking. It is that event which gives rise to the claim for compensation and fixes the

7

date as of which the land is to be valued and the Government's obligation to pay interest accrues.

Id. at 21-22 (citations omitted). The Court therefore held that when the Government files a declaration of taking after it has entered into possession of private property, "the date of taking' is the date on which the Government entered and appropriated the property to public use." Id. at 23. The Court explained:

> [I]n cases where there has been an entry into possession before the filing of a declaration of taking, such entry has been considered the time of "taking" for purposes of valuing the property and fixing the date on which the Government's obligation to pay interest begins to run. To rule that the date of "taking" is the time of filing would confront us with a Hobson's choice. On the one hand, it would certainly be bizarre to hold that there were two different "takings" of the same property, with some incidents of the taking determined as of one date and some as of the other. On the other hand, to rule that for all purposes the time of taking is the time of filing would open the door to anomalous results. For example, if the value of the property changed between the time the Government took possession and the time of filing, payment as of the latter date would not be an accurate reflection of the value of what the property owner gave up and the Government acquired.

Id. at 24 (emphasis added). See also Best v. Humboldt Placer Mining Co., 371 U.S. 334, 340 (1963) (holding that while "[t]itle to the property passes later, . . . the entry into possession marks the taking, gives rise to the claim for compensation, and fixes the date as of which the property is to be valued").

In the instant case, the district court granted the Government immediate possession of an easement over the Property in 1954 pursuant to the Rivers and Harbors Appropriation Act. The parties have stipulated that the Government actually entered into possession of an easement on the Property on March 9, 1956 under the invalid Georgia Easement. On August 30, 1994, the Government filed a complaint of condemnation for the fee simple absolute, filed a declaration of taking

8

pursuant to the Taking Act, and deposited the estimated amount of just compensation with the court. Thus, since the Government filed the declaration of taking after it entered into possession of an easement on the Property, "the date of `taking' is the date on which the Government entered and appropriated the property to public use." Dow, 357 U.S. at 23. The district court therefore correctly concluded that a taking of at least part of the Property occurred on March 9, 1956.

The Landowners' arguments to the contrary lack merit. They argue that no taking occurred until 1994 because, unlike in Dow, the Government in the instant case did not enter into possession of the Property by "seizing" it. Since the Government possessed the Property pursuant to the Georgia Easement, and since Georgia voluntarily agreed to the Easement, they argue that the Government's entry and possession in 1956 did not amount to a taking. They cite several cases in support of their view that the Government's possession of private property pursuant to a voluntary contract right does not constitute a taking.

For example, in United States v. Bedford Assocs. , 657 F.2d 1300 (2d Cir. 1981), the Government occupied space in a private office building pursuant to a lease that the Second Circuit later declared was unenforceable. In anticipation of a condemnation action by the Government, the court stated:

> In the event that the government elects to condemn an interest in the premises, we think it plain that just compensation for the taking so accomplished must be determined as of the date of the government's statutory election. Throughout the proceedings in this case, the government has disclaimed any exercise of its power of eminent domain, and has vigorously contended that it occupies [the property] by contractual right. Because the government's occupancy has been merely the assertion of a contract right, it was not a seizure of the premises within the contemplation of cases such as United States v. Dow, 357 U.S. 17 (1958). This is true even though, as we have held above, the government's lease was not specifically enforceable. The government cannot be said to have taken property merely because its good

9

faith estimate of the enforceability of its contractual rights later proves mistaken. Accordingly, any taking of an interest in [the property] can occur only after the government has abandoned its insistence upon its contractual right to occupy the building, as it must after our rejection of its claim for specific performance, and asserts a right to occupancy based upon its prerogatives as sovereign.

Id. at 1318 (citations omitted). The Landowners argue that cases such as Bedford Assocs. stand for the proposition that occupancy under a contract right, even if unenforceable, is not the type of "taking" that Dow contemplated. They therefore argue that the Government's possession and occupancy of the Property under the Georgia Easement is not a taking even though the district court later declared the Easement invalid.

Although the Landowners' argument is appealing at first blush, it ultimately lacks merit because of the unique facts of the instant case. In Bedford Assocs. and the other cases that the Landowners cite, the landowner at issue entered into a voluntary contract with the Government, and the Government had no intent at the time of the contract to condemn or appropriate the property. In the instant case, however, the Government entered into the easement with Georgia, not with the Landowners. Moreover, the Georgia Easement was not exactly voluntary. The Government had already filed a condemnation action to obtain a perpetual easement over the Property, and the district court had already granted the Government immediate possession of the Property pursuant to the Rivers and Harbors Appropriation Act. The Landowners stress that the Government subsequently dismissed the 1952 condemnation action. However, the Government only dismissed the action after Georgia "voluntarily" agreed to give the Government what it sought in the condemnation action, presumably in order to save litigation costs. Unlike the cases that the Landowners cite, the Government in the instant case clearly intended to appropriate an interest in the Property at the time it entered into possession of the Property in 1956.

Moreover, if we concluded that no taking occurred until August 30, 1994 and valued the fee simple absolute as of that date, the Landowners would receive a substantial windfall due to the Government's

10

efforts over the past forty years. The Government's spoil deposits have turned the previously marshy, separate islands into dry land connected to the South Carolina shore. If we picked the 1994 market value of the fee simple absolute, the Landowners would receive compensation far in excess of the Property's value on the date that the Government actually appropriated and began using the Property for public use. As the Dow Court held, "payment as of the latter date would not be an accurate reflection of the value of what the property owner gave up and the Government acquired." Dow, 357 U.S. at 24. Thus, the district court correctly held that the Government took at least some interest in the Property on March 9, 1956.

B.

We conclude, however, that the district court erred in holding that the Government took the entire fee simple absolute on March 9, 1956. The evidence clearly demonstrates that the Government only took an easement in the Property on that date. The Government's original condemnation action in 1952 only sought an easement over the Property, and Georgia only granted an easement in 1956. Moreover, the Landowners asserted in many affidavits that they have used the Property for recreational and hunting purposes for the past forty years. Landowner Murdaugh asserted that the Georgia Department of Transportation (the "GDOT") gave him a key to the gate surrounding the Island in the early 1970s, and Landowner Eltzroth asserted that the GDOT gave him a key in 1985. The Government has not contested the truth of the Landowners' affidavits. Furthermore, the GDOT letter that accompanied Eltzroth's key stated in part:

> I understand that [a GDOT employee] discussed our current diking problem with you and explained our interest in having your property available for dredge storage. Flexibility to place dredge material, we believe, is the key to long term land storage. Your property enhances that flexibility and in the long term such material placement could raise the value of the property. I believe mutual[ly] beneficial arrangements can be made.

(emphasis added). The affidavits clearly reveal that the Government and Georgia never believed that they had "taken" a fee simple abso-

11

lute in 1956. The Landowners continued to use the Property, and the Government thus never exclusively possessed the fee simple. The original condemnation action and the GDOT letter reveal that the Government only intended to take, and only believed that it had taken, an easement, and it still acted as if the Landowners owned the fee.[5] We therefore conclude that the Government only entered into possession of an easement on March 9, 1956.

The parties have not cited, and we have been unable to find, any case where the Government entered into possession and "took" a limited interest in private property and then subsequently filed a declaration of taking for a greater interest in the property. However, since the Government entered into possession of an easement on March 9, 1956, before it filed any declaration of taking, we conclude that the taking of the easement occurred on March 9, 1956. See Dow, 357 U.S. at 22 (holding that when the "United States has entered into possession of the property prior to the acquisition of title, it is the former event which constitutes the act of taking"). But the Government never entered into possession of the remaining interest in the Property, the fee simple absolute subject to the easement. Therefore, the taking of the remaining interest in the Property did not occur until August 30, 1994 when the Government filed the declaration of taking and stated that it intended to take the entire fee. Id. at 23 (holding that "when the Government files a declaration before it has entered into possession of the property the filing constitutes the `taking'").

III.

The date of taking "fixes the date as of which the land is to be valued and the Government's obligation to pay interest accrues." Dow, 357 U.S. at 22. Accordingly, Georgia must pay the Landowners the

_____

[5] We must note that we do not understand why the GDOT referred to the Property in the 1985 letter as the Landowners' Property. At that point, the Supreme Court had not yet reversed the Fifth Circuit's 1955 opinion which held that the Island belonged to Georgia. Thus, if anything, the Government should have thought that Georgia owned the fee simple, not the Landowners. Nonetheless, the Government's and Georgia's actions clearly reveal that they assumed that the Landowners retained the fee simple.

12

market value of the easement on March 9, 1956, plus interest from that date until it fully pays the award. In addition, Georgia must pay the Landowners the market value of the remaining interest in the Property, the encumbered fee simple absolute subject to the easement, on August 30, 1994, plus interest until payment. We reverse the district court's judgment and remand for further proceedings.

REVERSED AND REMANDED

13