496 S.E.2d 643

Sam B. McQUEEN, Respondent,

v.

SOUTH CAROLINA COASTAL COUNCIL, n/k/a South Carolina
Department of Health and Environmental Control, Office of
Ocean and Coastal Resource Management, Appellant.

No. 2779.

Court of Appeals of South Carolina.

Heard Dec. 2, 1997.
Decided Jan. 12, 1998.
Rehearing Denied Mar. 19, 1998.

Connor, J., issued opinion concurring in part and dissent-
ing in part.

Mary D. Shahid, Chief Counsel, S.C. Department of Health and Environmental Control, Office of Ocean and Coastal Resource Management (formerly South Carolina Coastal Council), Charleston, for Appellant.

Ronald R. Norton, Conway, for Respondent.

ANDERSON, Judge:

Sam B. McQueen applied to the South Carolina Coastal Council [1] for permits to bulkhead [2] and backfill two nonconti-

---

1. The South Carolina Coastal Council is now known as the South Carolina Department of Health and Environmental Control, Office of Ocean and Coastal Resource Management.

2. A bulkhead is "a retaining wall designed to retain fill material but not to withstand wave forces on an exposed shoreline." S.C.Code Ann. § 48–39–270(1)(b) (Supp.1996).

guous lots he owns in the Cherry Grove section of North Myrtle Beach. The Coastal Council denied the permits, and McQueen appealed to the circuit court. The matter was referred to the master-in-equity to enter a decision with finality. The master found a taking had occurred and ordered that McQueen be compensated $100,000. The Coastal Council appeals. We affirm in part, reverse in part, and remand.

## FACTUAL/PROCEDURAL BACKGROUND

In 1961, Sam McQueen bought a lot on 53rd Avenue in Cherry Grove. In 1963, he bought a second lot in Cherry Grove on 48th Avenue. Both lots are located on manmade, saltwater canals. The lots in these neighborhoods were created from fill. McQueen's lots are undeveloped and are surrounded by other lots which have bulkheads. Houses have been constructed on most of the surrounding lots.

In July 1991, McQueen applied to the South Carolina Coastal Council to erect bulkheads on both of his lots to prevent further erosion. In January 1992, the Coastal Council issued a permit for the 53rd Avenue lot only. Attached to the permit was a stipulation that the bulkhead be constructed 75 feet from the street. In response, McQueen sought a 90–foot setback so that he could build on the property. Although applications for both lots were submitted with filing fees for each attached, the public notice issued by the Army Corps of Engineers (which participated in the permitting process) concerned only the 53rd Avenue lot. As a result of this confusion, action was taken only on the 53rd Avenue lot.

In a letter dated April 2, 1993, the Coastal Council stated that its failure to act on the 48th Avenue lot was because the Army Corps of Engineers sent the Council a public notice which referred only to the 53rd Avenue lot. In its letter, the Council stated, "It would appear to us that the only way to correct this confusion would be to submit a new application to the Corps or have them contact the Corps and issue a corrected public notice. Once this is accomplished, we will start our review process again."

McQueen resubmitted his applications for each lot in June 1993. No other government agency with input into the matter opposed the application, and neighbors wrote to the Coastal

Council on McQueen's behalf because the erosion on his property, where there were no bulkheads, was creating erosion on their lots. The permit administrator advised McQueen in September 1993 that both permits were being denied because the proposed bulkheads were located within "the tidelands critical area, so that any backfill results in the filling of tidal wetlands." The administrator stated filling the areas would have "an adverse environmental impact" and would serve "no overriding public interest."

McQueen sought review of the staff decision by the Coastal Council. An evidentiary hearing was held on January 21, 1994 before a hearing officer appointed by the Council to make findings of fact and recommendations to the full Council. McQueen's main grounds for the appeal were that (1) erosion control was needed on the lots; (2) the lots were originally man-made, and the bulkheads and fill would only refill previously altered areas; (3) sedimentation is having adverse effects on the canals; (4) the Army Corps of Engineers had previously approved the plans; (5) when the property was originally purchased, no restrictions were in place; and (6) the denial totally devalued the lots and amounted to an unconstitutional taking. The hearing officer recommended that the denial of the 48th Avenue lot be upheld and that the 53rd Avenue denial be overturned, "subject to the issuance of a permit substantially in accordance with the 1992 permit."

The Coastal Council refused to follow the hearing officer's recommendations and denied both permits again. Upon further review, the Coastal Zone Management Appellate Panel upheld the denials of both permits. The Panel found that the permits sought by McQueen were prohibited by S.C.Code Ann.Regs. 30–12(G)(2)(a) (Supp.1996), which provides that the creation of residential lots for private gain is not justification for filling in wetlands and that permit applications for this purpose should be denied. The Panel determined McQueen had failed to establish the denial of the permits amounted to a taking.

McQueen appealed the Panel's decision to the circuit court, arguing the permit denials constituted a taking without just compensation. Upon referral, the master-in-equity found that by denying McQueen the permits, the Coastal Council had

deprived him of all economically beneficial use of the property, resulting in a taking. The master found McQueen was entitled to $50,000 in compensation for each lot, or a total of $100,000. The Coastal Council appeals.

## STANDARD OF REVIEW

■■■ The circuit court may review a decision made by the Appellate Panel "de novo." S.C.Code Ann. § 48–39–180 (Supp.1996). However, "statutes undertaking to give the courts de novo review of orders of administrative bodies exercising non-judicial functions are generally construed as providing for only a limited review." *Guerard v. Whitner,* 276 S.C. 521, 522, 280 S.E.2d 539, 540 (1981) (quoting *Board of Bank Control v. Thomason,* 236 S.C. 158, 113 S.E.2d 544 (1960)). "[T]he substantial evidence standard . . . is the proper standard for review of actions by the Coastal Council." *Id.* at 523–24, 280 S.E.2d at 540. This court need only find that, looking at the entire record, "evidence that 'would allow reasonable minds to reach the conclusion that the administrative agency reached.'" *Grant v. South Carolina Coastal Council,* 319 S.C. 348, 353, 461 S.E.2d 388, 391 (1995) (quoting *Carter v. South Carolina Coastal Council,* 281 S.C. 201, 314 S.E.2d 327 (1984)). The mere possibility of drawing two inconsistent conclusions from the evidence does not prevent a finding from being supported by substantial evidence. *Id.*

## ISSUES

I. Did the master err by basing his findings and conclusions of law on alleged irregularities committed by the Coastal Council?

II. Is there substantial evidence in the record to support the Council's decision to deny the permits?

III. Did the master err in finding that the Council's permit denials deprived McQueen of all economically beneficial use of his property, resulting in an unconstitutional taking without just compensation?

## LAW/ANALYSIS

I. Delays in the Permitting Process

■■ The Coastal Council first argues that the master erred by basing his findings and conclusions of law on alleged

irregularities it found in the Coastal Council's permitting process. The Council objects to the findings because it believes they prejudice this appeal.

The master did indeed find, *inter alia*, that (1) "for some unexplained reason, the [Coastal Council] did not issue a permit for the 48th Avenue lot even though the testimony reveals that the biologist and regional permit administrator in the Myrtle Beach office of the [Coastal Council] recommended approval of the 48th Avenue permit"; (2) "as a result of lack of action, mishandling and confusion caused by the [Coastal Council], the [Council] instructed Mr. McQueen to resubmit his applications to correct the confusion"; and (3) the Coastal Council issued denial letters for both lots more than 90 days after the filing of the applications, "contrary to the mandatory [statutory] requirements . . . to act upon applications within 90 days of the filing." The master noted the significance of the reapplication process was that two additional years of erosion had occurred.

The master concluded that, once the permits were denied, a taking had occurred entitling McQueen to compensation. In our view, any irregularities, sloppiness, or undue delay on the part of the Coastal Council that the master did notice are irrelevant for purposes of this appeal as they do not affect the master's ultimate conclusion that a taking had occurred. *See McCall v. Finley*, 294 S.C. 1, 4, 362 S.E.2d 26, 28 (Ct.App. 1987) ("[W]hatever doesn't make any difference, doesn't matter."); *Cox v. Cox*, 290 S.C. 245, 349 S.E.2d 92 (Ct.App.1986) (appellant has burden of showing alleged error was prejudicial).

## II. Sufficiency of Evidence to Support Denial of Permits

■ Secondly, the Coastal Council seeks affirmance that the record supports the denial of the permits on the basis that the lots were wetlands and that erecting bulkheads and adding fill to the lots would have an adverse environmental impact. We agree. This Court need only find that, looking at the entire record, there is evidence which would allow reasonable minds to reach the conclusion that the administrative agency reached. *Grant*, 319 S.C. 348, 461 S.E.2d 388; *Carter*, 281 S.C. 201, 314 S.E.2d 327.

Here, there was evidence that the critical area [3] line on the 48th Avenue lot had moved inward, a decision based on salt-tolerant vegetation found growing on the lots, *e.g.*, *borrichia frutescens* and *spartina alterniflora*, which are indicators of a critical area. According to the Coastal Council's biologist, critical areas provide food for the marine estuarine system, create a habitat for fish and shellfish, buffer high ground, and filter sediments and pollutants. Building bulkheads and adding fill to these lots would destroy the area permanently. The biologist also found the majority of the 53rd Avenue lot was in a critical area. He noted the lot was regularly inundated with tidal flow. The biologist testified the 53rd Avenue lot served as a fish and shellfish habitat, and that building a bulkhead would likewise have a detrimental effect. It is plain from the record that one could find the lots were in critical areas and that the permits should be denied as a result.

III. *Lucas v. South Carolina Coastal Council:* Taking Occurs Where Government Action Deprives Landowner of All Economically Beneficial Use of Land

Finally, the Coastal Council alleges the master erred in concluding that a taking had occurred and in ordering McQueen to be compensated. We disagree.

 Under the Coastal Zone Management Act, it is the state's goal "[t]o promote economic and social improvement of the citizens of this State" while "protect[ing] the sensitive and fragile areas from inappropriate development and provid[ing] adequate environmental safeguards with respect to the construction of facilities in the critical areas of the coastal zone." S.C.Code Ann. § 48–39–30(1) (Supp.1996). Although the state may pursue this goal zealously, such alacrity may not lead to the unreasonable exercise of the state's police power which results in an uncompensated taking. The United States Supreme Court recently espoused the rationale for this limit in

---

3. "Critical areas" include coastal waters, tidelands, beaches, and beach/dune systems. S.C.Code Ann. § 48–39–10(J) (Supp.1996). "Coastal wetlands" means "those areas periodically inundated by saline waters ... and those areas that are normally characterized by the prevalence of saline water vegetation capable of growth and reproduction." S.C.Code Ann. § 48–39–10(G) (Supp.1996).

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), wherein the Court stated:

Prior to Justice Holmes's exposition in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), it was generally thought that the Takings Clause reached only a "direct appropriation" of property, *Legal Tender Cases*, 12 Wall. 457, 551, 20 L.Ed. 287 (1870), or the functional equivalent of a "practical ouster of [the owner's] possession," *Transportation Co. v. Chicago*, 99 U.S. 635, 642, 25 L.Ed. 336 (1878). See also *Gibson v. United States*, 166 U.S. 269, 275–276, 17 S.Ct. 578, 580, 41 L.Ed. 996 (1897). Justice Holmes recognized in *Mahon*, however, that if the protection against physical appropriations of private property was to be meaningfully enforced, the government's power to redefine the range of interests included in the ownership of property was necessarily constrained by constitutional limits. 260 U.S., at 414–415, 43 S.Ct., at 160. If, instead, the uses of private property were subject to unbridled, uncompensated qualification under the police power, "the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed]." *Id.*, at 415, 43 S.Ct., at 160. These considerations gave birth in that case to the oft-cited maxim that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Ibid.*

Nevertheless, our decision in *Mahon* offered little insight into when, and under what circumstances, a given regulation would be seen as going "too far" for purposes of the Fifth Amendment. In 70–odd years of succeeding "regulatory takings" jurisprudence, we have generally eschewed any " 'set formula' " for determining how far is too far, preferring to "engag[e] in ... essentially ad hoc, factual inquiries." *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (quoting *Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962)). See Epstein, Takings: Descent and Resurrection, 1987 S.Ct.Rev. 1, 4. We have, however, described at least two discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the

restraint. The first encompasses regulations that compel the property owner to suffer a physical "invasion" of his property. In general (at least with regard to permanent invasions), no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation....

The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land. See *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106; see also *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987); *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 495, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987); *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 295–296, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981). As we have said on numerous occasions, the Fifth Amendment is violated when land-use regulation "does not substantially advance legitimate state interests *or denies an owner economically viable use of his land.*" *Agins, supra*, 447 U.S., at 260, 100 S.Ct., at 2141 (citations omitted) (emphasis added).

*Id.*, 505 U.S. at 1014–16, 112 S.Ct. at 2892–94.

Appellant argues *Lucas* is inapposite to this case and relies heavily on *Carter v. South Carolina Coastal Council*, 281 S.C. 201, 314 S.E.2d 327, in its brief.[4] We would note, however, that the United States Supreme Court emasculated *Carter* with respect to takings in its *Lucas* opinion. In dissonance to the position taken by the Coastal Council, we conclude the case at bar epitomizes a remarkable similitude to *Lucas.*

Like McQueen, Lucas was a coastal property owner. He purchased his land in 1986, two years before the passage of the Beachfront Management Act in 1988. The Act, which redrew setback lines, prohibited Lucas from building "any

---

4. In *Carter,* the South Carolina Supreme Court upheld the Coastal Council's denial of a permit to fill in marshlands as a legitimate exercise of the state's police power rather than an unreasonable taking. The court stated that a landowner has no absolute right to change the "essential natural character" of the land in order to use the land for a purpose for which it was unsuited in its natural state and which injures the rights of others. *Id.* at 204, 314 S.E.2d at 329.

permanent structure (including a dwelling), save a small deck or walkway" on his property. *Lucas v. South Carolina Coastal Council*, 304 S.C. 376, 378, 404 S.E.2d 895, 896 (1991). McQueen likewise bought his property prior to the 1977 enactment of the Coastal Zone Management Act, under which he is unable to prepare his lots for building, an activity allowed when he bought the property. As the United States Supreme Court observed in *Lucas:*

> Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. This accords, we think, with our "takings" jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the "bundle of rights" that they acquire when they obtain title to property. It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; "[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power." *Pennsylvania Coal Co. v. Mahon*, 260 U.S., at 413, 43 S.Ct., at 159. And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale). See *Andrus v. Allard*, 444 U.S. 51, 66–67, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979) (prohibition on sale of eagle feathers). In the case of land, however, we think the notion pressed by the Council that title is somehow held subject to the "implied limitation" that the State may subsequently eliminate all economically valuable use is inconsistent with the historical compact recorded in the Takings Clause that has become part of our constitutional culture.
>
> Where "permanent physical occupation" of land is concerned, we have refused to allow the government to decree it anew (without compensation), no matter how weighty the

asserted "public interests" involved, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S., at 426, 102 S.Ct., at 3171—though we assuredly *would* permit the government to assert a permanent easement that was a pre-existing limitation upon the landowner's title.

*Lucas*, 505 U.S. at 1027–1029, 112 S.Ct. at 2899–2900.

It is the 1977 regulations and their progeny which have deprived McQueen of the ability to develop his lots, an expectation he clearly had when he purchased the lots over 30 years ago. McQueen's lots are among the few in the immediate vicinity which do not have bulkheads; his neighbors continue to use the existing retaining devices located on their properties and permanent dwellings have been constructed on most of the surrounding lots. *See Lucas*, 505 U.S. at 1031, 112 S.Ct. at 2901 ("The fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of any common-law prohibition.... So also does the fact that other landowners, similarly situated, are permitted to continue the use denied to the claimant.").

The Coastal Council again tries to distinguish this case from *Lucas* on the basis that Lucas merely wanted to build on his property, whereas McQueen wants to "alter the character" of his lots.[5] We find this distinction to be without merit. The definitive issue is what rights McQueen possessed when he purchased the lots and, just as the right to build was one of Lucas's rights, the right to add a bulkhead and fill were McQueen's at the time of purchase.

Further, the Coastal Council argues that, although he is unable to build on his lots, McQueen has not lost all economically beneficial use of his land. The Supreme Court stated the following rule in determining whether a taking has occurred:

We think, in short, that there are good reasons for our frequently expressed belief that when the owner of real property has been called upon to sacrifice *all* economically

---

**5.** The Coastal Council also argues that McQueen knew his lots were eroding for some time, and that he failed to take preventative measures earlier. However, the Council cites no legal precedent for this duty, and as such, its conclusory argument will not be considered. *Solomon v. City Realty Co.*, 262 S.C. 198, 203 S.E.2d 435 (1974) (conclusory exceptions are deemed effectively abandoned on appeal).

beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking.

*Lucas,* 505 U.S. at 1019, 112 S.Ct. at 2895.

Regrettably, the rhetorical force of the "deprivation of all economically beneficial use" rule is not imbued with precision. In any event, we avoid this difficulty in the present case since the master found the denial of the permit left each of McQueen's lots without any economically beneficial use. In our opinion, there is evidence to support the master's finding.

McQueen testified that he is unable to do anything with either lot, including park a boat on one. The only use of the land available to McQueen after the permit denials the Council could show was "[r]ecreational, aesthetic use" that the Council's own expert testified is "really probably not directly recreational." The Council employee conceded that the recreational value to McQueen is "kind of indirect," stating, "I don't think Mr. McQueen would like everybody to come out there to crab or fish on his lots." This use does not truly benefit McQueen. We hold McQueen has suffered a textbook taking.

## Just Compensation

Because we uphold the master's finding that there was a taking, McQueen is entitled to compensation. McQueen testified he paid $2,500 for the lot he purchased in 1961 (the 53rd Avenue lot) and approximately $1,700 for the one he purchased in 1963 (the 48th Avenue lot). He testified he had received offers of $50,000 on each of the two lots. However, McQueen also stated the current tax assessment value for each of the two lots was $22,800. Therefore, we find there was insufficient evidence in the record to support the master's determination that McQueen was entitled to a total of $100,000 as compensation for the taking of both lots. McQueen did not directly testify as to the value of the two lots. The record contains a response by McQueen to a cross-examination query that he received *offers* on the two lots. This testimony does not comport with the rule in South Carolina that a landowner may give testimony regarding the value of his property. *Whisenant v. James Island Corp.,* 277 S.C. 10, 281 S.E.2d 794 (1981) (a property owner, familiar with his property and its

value, may give his estimate as to its value, even though he is not an expert); *South Carolina State Highway Dept. v. Wilson*, 254 S.C. 360, 175 S.E.2d 391 (1970) (same).

## CONCLUSION

For the foregoing reasons, we hold the Coastal Council's denial of McQueen's permit applications for the two lots deprives him of all economically beneficial use of the land and constitutes a taking for which McQueen is entitled to compensation. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798. There is insufficient evidence in the record to support the master's determination as to the amount of compensation. The issue of just compensation is remanded to the circuit court for a determination of the amount of compensation. The amount of compensation shall be determined as of the date of the taking. *United States v. Eltzroth*, 124 F.3d 632 (4th Cir.1997). Accordingly, the decision of the master is affirmed in part, reversed in part, and remanded to the circuit court.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

HUFF, J., concurs.

CONNOR, J., concurs in part and dissents in part in a separate opinion.

CONNOR, J. (Concurring in part and dissenting in part.):

I agree the record contains sufficient evidence to support Coastal Council's decision to deny the permits at issue. I also concur that delays in the permitting process are irrelevant to the merits of this appeal. However, I respectfully disagree with the majority that a taking has occurred, believing the facts of this case to be clearly distinguishable from those in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). I would reverse the master on the takings issue.

We are bound by the factual findings of the Coastal Council unless no substantial evidence exists to support them. *Guer-*

*ard v. Whitner,* 276 S.C. 521, 280 S.E.2d 539 (1981). Council's facts follow.

McQueen bought the 53rd Avenue lot in 1961 for $2,500 and the 48th Avenue lot in 1963 for $1,700. Each lot is valued at $22,500 for tax purposes.

Both unimproved lots are located on filled, dead-end, salt water canals. Both have "substantially reverted to wetlands" and constitute "predominantly critical area." Most, if not all, of the other lots in this area contain improvements and some type of bulkhead or retaining wall.

The 48th Avenue lot contains "borrichia, spartina patens and spartina alterniflora." It is "high marsh," which "serves the vital function of acting as a buffer and a filter from sediments and run-off." The lot provides "habitat for birds, shellfish, and fish."

The 53rd Avenue lot, which has a lower elevation, attains "greater tidal flow." It is "unvegetated, filled with brack and other decaying critical area plants," having "tidal inundation reaching from the canal to the road." The lot serves as an "integral part of the estuarine environment as marine transport areas, for larval forms of shrimp and other marine life."

Even though erosion on the lots began around 1974, as late as 1989 the condition was still "not characterized as severe." McQueen "took no action to protect his property from erosion" from the time he purchased it until he initiated these applications.[1]

The majority finds this case remarkably similar to *Lucas.* I believe these facts are quite distinguishable from those in *Lucas.*

Lucas paid $975,000 for two lots, intending to build residential homes. *Lucas,* 505 U.S. at 1006, 112 S.Ct. at 2888. Two years later, the state passed legislation which basically prohibited Lucas from building habitable structures on his land. *Id.* at 1007, 112 S.Ct. at 2888. The United States Supreme Court held Lucas' ability to build on his property was contained in the "bundle of rights" he acquired when he first bought the

---

1. The hearing officer, in his Findings of Fact and Recommendations, reported McQueen met a Coastal Council representative at his lots between 1982 and 1984 to discuss the options concerning his property.

property. *Id.* at 1027, 112 S.Ct. at 2899. The Court reasoned under these facts the state had taken Lucas' property without just compensation in violation of the Fourteenth Amendment, if it sought to regulate uses which were not already prohibited by background principles of nuisance and property law. *Id.* at 1031, 112 S.Ct. at 2901.

McQueen bought his property in the early 60's. The state Legislature passed the Coastal Zone Management Act, which prohibited the filling of marsh, in 1977. ' Over time, nature began reclaiming McQueen's lots. McQueen did nothing. McQueen's neighbors sought and gained permits to build bulkheads or retaining walls to protect their property from erosion. McQueen did nothing. McQueen met with a representative of Coastal Council sometime between 1982 and 1984 to ascertain his alternatives. Afterwards, McQueen did nothing. The process of erosion continued, until McQueen's property basically reverted back to marshland. Still, McQueen did nothing. Finally he applied for a bulkhead and backfill permit in 1991 so that he could build on his property. Now, McQueen wants the state to compensate him because he says a state regulation has made his property economically worthless.

The majority finds "the case at bar epitomizes a remarkable similitude to *Lucas.*" It goes on to point out both Lucas and McQueen were denied the right to build on their property because regulations with certain restrictions were passed; these regulations were not in force when they first purchased their property. However, McQueen was not prohibited from building a house. He was prohibited from backfilling marsh, which he would not have had to do at all had he been a responsible landowner.

Even though the court in *Lucas* to some extent enumerated a bright-line test for ascertaining whether a taking had occurred, it still required a limited case-by-case analysis by remanding for South Carolina to make a determination whether the prohibited action violated any principles of state nuisance *and* property law. *Lucas,* 505 U.S. at 1031, 112 S.Ct. at 2901. In remanding the *Lucas* case to the state of South Carolina, Justice Scalia, writing for the majority, explained the state had to do more than "proffer the legislature's declaration that the uses Lucas desires are inconsistent with the public interest." *Id.* at 1031, 112 S.Ct. at 2901. Rather, it had to

"identify background principles of nuisance *and property law* that prohibit the uses he (Lucas) now intends in the circumstances in which the property is presently found." *Lucas,* 505 U.S. at 1031, 112 S.Ct. at 2902 (emphasis added). *See also* 106 Harv.L.Rev. 163 at 272–73 (1992). ("[R]egulation that renders property valueless will be exempt from compensation only when it prohibits that which common-law nuisance principles *or other 'background principles'* have always prohibited.") (emphasis added).[2]

In *Lucas,* Justice Scalia quoted Lord Coke, who said, "[w]hat is the land but the profits thereof?" *Lucas,* 505 U.S. at 1017, 112 S.Ct. at 2894 (quoting 1 E. Coke, *Institutes,* ch. 1, § 1 (1st Am.Ed.1812)). In 1994, the Federal Circuit of the United States Court of Appeals, interpreting *Lucas* in light of the entire history of regulatory takings, held courts must consider whether or not the property owner had distinct "investment-backed expectations" in determining whether or not a regulatory taking had occurred. *Loveladies Harbor, Inc., et al. v. United States,* 28 F.3d 1171 (Fed.Cir.1994). *See also Property Myths, Judicial Activism, And The Lucas Case,* 23 Envtl.L. 907, 916 (1993) ("In the final analysis, from a property lawyer's perspective, Lucas is a flawed decision because it assumes that property rights amount to developmental rights.").

Under a *Lucas* and *Loveladies Harbor* analysis, I do not believe the state has taken McQueen's property. McQueen sat idly by for almost thirty years, observing his land eroding as most of his neighbors applied for and received permits to build bulkheads or retaining walls to protect their property. Meanwhile, nature reclaimed McQueen's property. As the hearing officer stated in his report, "[t]his lot, by the passage of *time* and *tides* for the past 30 years, has become unbuildable." (Emphasis added).

The majority finds the fact that McQueen's neighbors have been granted permits indicates McQueen should be granted this same right. The majority cites the following language

---

2. In a case such as McQueen's, where a property owner does nothing, even though cognizant external forces are detrimentally affecting his property, analogies can be drawn to background principles of state property law such as adverse possession, staleness of claims, and even the statute of limitations.

from *Lucas:* "The fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of any common-law prohibition ... So does the fact that other landowners, similarly situated, are permitted to continue the use denied to the claimant." *Lucas,* 505 U.S. at 1031, 112 S.Ct. at 2901. However, the omitted phrase reads as follows: "[T]hough changed circumstances or new knowledge may make what was previously permissible no longer so." *Id.* The record contains no evidence any of McQueen's neighbors asked for permits to backfill marsh, the prohibited activity here. Rather, prior to the point in time when their property would need backfill, they apparently requested and received permits for bulkheads or retaining walls.

Moreover, Coastal Council held McQueen took no actions to protect his investment, and therefore failed to show he had "investment-backed expectations" under *Lucas* and *Loveladies Harbor.* As Council succinctly stated, McQueen's "expectations are relative to the measures he took to protect his investment."

I agree with Council. McQueen knew his lots were eroding and failed to act to protect his property. Now that the situation has become so critical, in order to build, he has had to request permission to violate state regulations prohibiting backfilling marsh, he cannot claim entitlement to compensation because the state "took" his property.

I would reverse on the takings issue.